1

```
1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE EASTERN DISTRICT OF TEXAS

3                      MARSHALL DIVISION

4    LAKE CHEROKEE HARD DRIVE )(

5    TECHNOLOGIES, LLC        )(   CIVIL DOCKET NO.

6                            )(   2:10-CV-216-JRG

7    VS.                      )(   MARSHALL, TEXAS

8                            )(

9    BASS COMPUTERS, ET AL.   )(   JULY 30, 2013

10                           )(   1:30 P.M.

11                    PRE-TRIAL HEARING

12           BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

13                 UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16

17   FOR THE PLAINTIFF:   (See Attorney Sign-in Sheet.)

18

19   FOR THE DEFENDANTS:  (See Attorney Sign-in Sheet.)

20

21   COURT REPORTER:      MS. SHELLY HOLMES, CSR
                          Official Court Reporter
22                        Eastern District of Texas
                          Marshall Division
23                        100 E. Houston Street
                          Marshall, Texas 75670
24                        (903) 935-3868

25   (Proceedings recorded by mechanical stenography,
```

transcript produced on a CAT system.)

2

1                       I N D E X

2

3    July 30, 2013

4                                            Page

5        Appearances                          1

6        Hearing                              3

7        Court Reporter's Certificate        140

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    COURT SECURITY OFFICER:  All rise.

 2                    THE COURT:  Be seated, please.

 3                    All right.  This is the time set for a

 4      pre-trial hearing in regard to Lake Cherokee Hard Drive

 5      Technologies versus Marvell Semiconductor, Inc.  This is

 6      Civil Action 2:10-CV-216.

 7                    The Court will call for announcements.

 8                    What says the Plaintiff?

 9                    MR. BUNT:  Good afternoon, Your Honor.

10      Chris Bunt here on behalf of Lake Cherokee.  Also with

11      me is Mr. Greg Dovel.

12                    MR. DOVEL:  Good afternoon, Your Honor.

13                    MR. BUNT:  Mr. Julien Adams.

14                    MR. ADAMS:  Good afternoon, Your Honor.

15                    MR. BUNT:  Our corporate rep, Mr. Tom

16      Coverstone, and my legal assistant, Deana Attaway is out

17      in the gallery, as well.  And we're ready to proceed,

18      Your Honor.

19                    THE COURT:  Thank you, counsel.

20                    What says the Defendant?

21                    MR. MANN:  Your Honor, Mark Mann on behalf

22      of MSI, Marvell, and we're ready to proceed.  And with

23      me is our lead counsel, Ruffin Cordell --

24                    MR. CORDELL:  Good afternoon.

25                    MR. MANN:  And Joe Colaianni.
```

```
 1              MR. COLAIANNI:  Good afternoon.

 2              MR. MANN:  Adam Shartzer.

 3              MR. SHARTZER:  Good afternoon, Your Honor.

 4              MR. MANN:  Indranil Mukerji.  I did much

 5    better than last time, Your Honor.  Keeley Vega,

 6    Jennifer Scarpati, my esteemed partner, Andy Tindel, and

 7    from general counsel's office, Jim Laufman and Jinping

 8    Yang.

 9              THE COURT:  All right.  Thank you.

10              All right.  Before we get into the specific

11    contested motions that are before the Court, I want to

12    go over some basic housekeeping matters for counsel with

13    regard to the upcoming trial of this cause.

14              As you know, jury selection is scheduled for

15    Monday, August the 5th.  We're going to begin jury

16    selection at 1:00 o'clock.  It may be 1:15, but sometime

17    shortly at or shortly after 1:00 o'clock in the

18    afternoon.

19              Also, in addition to the pre-trial hearing

20    that we're going to conduct today, I've reserved

21    Wednesday, August the 7th, at 9:00 a.m. for additional

22    pre-trial that may be necessary given what we're able to

23    cover this afternoon.  So you need to reserve August the

24    7th, beginning at 9:00 o'clock that morning, as an

25    additional pre-trial hearing date in this case.
```

1            The Court's identified either the week of

2   August the 12th or August the 19th for trial of this

3   case.  I cannot tell you as of today which of those two

4   dates it will be.  I should be able to tell you that by

5   jury selection on the 5th, but you need to be ready

6   either of those two weeks.

7            During the trial of the case, the Court

8   intends to start each day's trial at approximately 8:30,

9   and I intend to go until approximately 5:30 each

10  afternoon.  Of course, those are somewhat subject to

11  change, depending on particularities that might arise

12  during the trial.

13           As is the Court's practice during the trial

14  of the case, Court will be in chambers each morning not

15  later that 7:30 a.m.  That means you'll have an hour

16  each morning during the trial where the Court will be

17  available to you before we begin that day's evidence.

18  That is -- that is particularly provided for so that if

19  there are disputes or issues that arise overnight, then

20  we can take them up and the Court can give you guidance

21  without eating into your designated trial time after the

22  trial starts at 8:30.  So that time is available for

23  your benefit, if it's needed.  And I would urge you to

24  take advantage of it, rather than save something that I

25  can deal with before we start the trial with something

1    that takes part of your time during the trial that day.

2              As to the voir dire, I'm going to allocate

3    30 minutes per side for examination of the panel.  As is

4    my practice, I'll afford each side up to three minutes

5    of that 30 minutes to give a very high level overview of

6    what they expect the evidence to show.

7              I caution both sides that that time is not

8    for you to argue your case.  And if I perceive that you

9    are arguing your case to the panel, I will call you on

10   it in front of the panel.  If you choose to use that

11   time for an overview, make sure it is a very high level,

12   general overview and not argumentative.  The remainder

13   of your time should be used to probe individual members

14   of the panel as to their qualifications and ability to

15   serve.

16             I intend to seat eight jurors in this case.

17   I intend to afford each side four preemptory challenges.

18             I have not seen a request for a jury

19   questionnaire, and quite frankly, at this date, it's too

20   late to have a jury questionnaire delivered to the panel

21   and returned by the 5th, so I think that has gone by the

22   boards as far as timing is concerned.

23             I intend to allocate 12 hours per side for

24   trial of the case.  And I will afford each side 20

25   minutes for opening statements, and you'll have 30

7

```
 1   minutes per side for closing statements.  You may divide
 2   your openings and your closings with co-counsel or you
 3   may not.  That's strictly up to you.  If you want a
 4   warning as to the expiration of your designated time
 5   either at opening or at closing, ask for that when you
 6   go to the podium to begin your argument.
 7               With regard to the use of deposition clips,
 8   if there are disputes regarding any portion of a
 9   proposed deposition clip to be played to the jury, I
10   want to know about it the day before it is intended to
11   be played.  And I will take those up on a rolling basis.
12   I do not want to find out about deposition clip disputes
13   the day that it's intended to be used.  If there are
14   going to be deposition clips in dispute for use the
15   first day of trial, the Plaintiff needs to know about
16   that and needs to call it to my attention on the 7th
17   when we take up additional pre-trial matters, and then,
18   obviously, the day before rolling through the week of
19   trial.
20               I intend that during this case, the eight
21   members of the jury selected to serve will be furnished
22   with a juror notebook, and I'm directing both sides to
23   cooperate in the preparation of those juror notebooks
24   for delivery to the Court.  They should be delivered in
25   care of the Court's law clerks by August the 7th, our
```

1  next pre-trial date.

2          Those juror notebooks should be a simple

3  three-ring binder.  They should contain a clean copy of

4  each of the patents-in-suit.  They should also contain a

5  list of the terms the Court has previously construed per

6  its Markman order and the resulting constructions.

7  Nothing other than the term and the resulting

8  construction.

9          Additionally, parties are directed to

10  provide for each juror notebook a single page for each

11  witness with a picture of a head and shoulders

12  photograph of that witness superimposed at the top of

13  that witness page and the name of the witness printed

14  below the picture.  Below that page, the rest of the

15  page should be simply ruled lines.  Don't designate

16  Plaintiff's expert, Dr. X, or Defendant's expert, Dr. Y.

17  Simply give the name of the witness.

18          I find that it is very helpful to the juries

19  as they deliberate to be able to see the picture of who

20  they -- who they heard testify.  If for any reason

21  there's a witness who's called who's -- was not

22  anticipated at the time the notebooks were put together,

23  I will allow -- assuming that the witness is properly

24  called, I will allow you to supplement and add a page

25  for a later witness, but, hopefully, we'll have all of

1    those in place in advance.

2            I'm directing that you prepare 10 of those

3    notebooks, 2 for the Court's benefit and 8 for the use

4    of the jury, and deliver those, again, by August the 7th

5    to the Court's clerk.

6            Also, each notebook should contain a -- a

7    legal pad, three-hole punched, for a note taking page to

8    the members of the jury.

9            We have a sample of jury notebooks we've

10   used in the past.  If any of you have doubts about what

11   it should contain, you can see my law clerks after the

12   hearing today and they can make a copy available to you

13   to review.

14           All right.  Any questions, counsel, as to

15   what I've just gone over?

16           MR. DOVEL:  Yes, Your Honor.  One question,

17   which is do you want the -- the pictures of deposition

18   witnesses or live witnesses or both?

19           THE COURT:  I think it's beneficial to have

20   a picture of everybody that testifies, whether --

21   whether they're live or whether they're by deposition.

22           Any other questions?  All right.

23           We'll now turn to and take up some of the

24   pending motions that are before the Court.  There

25   appears to be an agreed motion regarding Plaintiff's

1    Exhibits 301 through 494.  That's Document 373, with

2    request being that a PDF copy be allowed to be brought

3    in rather than the actual hard copies for purposes of

4    reviewing those exhibits.  I understand that's agreed

5    to, and assuming that agreement is still in place and

6    holding, the Court doesn't have an objection to that.

7    That motion will be granted.

8            All right.  Next, we have -- let me back up

9    just a minute.  With regard -- with regard to exhibits,

10   it's not likely that we will get to any disputed

11   exhibits as a part of today's pre-trial, but we'll

12   probably get to those at our next pre-trial conference.

13           But to make sure that everyone present

14   understands the Court's practice, it is my intent to

15   review any objections and rule on any objections to the

16   admissibility of exhibits prior to the beginning of the

17   case-in-chief, and to qualify the exhibits as

18   pre-admitted, that meaning that they -- the Court finds

19   that there's no impediment to their admissibility.  That

20   way, when the case is tried, you will be able to use

21   exhibits from that pre-admitted list without spending

22   your designated trial time going through the

23   qualification process, hearing objections, arguing the

24   objections, et cetera.  That, again, is part of the

25   Court's effort to allow you to maximize the efficiency

1   of your designated trial time.

2            If there are exhibits that don't draw an

3   objection, then they certainly will be within that pool.

4   If there are objections to exhibits, the Court will take

5   those up and rule on them.  Those exhibits that survive

6   the objection will also be a part of that pool of

7   pre-admitted exhibits.  The pre-admitted exhibits are

8   not necessarily in and of themselves a part of the

9   record in this case.

10           From that pool of pre-admitted exhibits,

11  those exhibits that are used by counsel before the jury

12  as a part of the trial become a part of the record.  And

13  it's -- will be my practice beginning on the second day

14  of the trial, before the jury is brought in, to have

15  each side go to the podium and read into the record the

16  exhibit numbers for the exhibits they used in the

17  preceding day's trial -- portion of the trial so that we

18  keep a running total of the exhibits that are identified

19  and used before the jury.

20           Those will be the exhibits that become a

21  part of the official record in this case.  Exhibits that

22  are within the pool of pre-admitted exhibits that are

23  never used during the trial before the jury will not be

24  a part of the record in this case.

25           I hope everyone understands that.  If there

1  are any questions about that, I'll be glad to go into

2  further detail.

3             With that in mind, before our next pre-trial

4  conference -- as a matter of fact, I'd like to have this

5  no later than the close of business on August the 5th.

6  I want you to file a joint notice of exhibit -- exhibit

7  objections with the Court and let that be a joint filing

8  so I can see your positions side-by-side in the same

9  document without having to go back and forth between

10  various separate documents.  And if there are exhibit

11  objections after you've met and conferred about the

12  exhibits in this case, then I want those laid out in

13  that joint notice so that I can clearly have them before

14  me and have a chance to review your competing positions

15  before we get to the 7th when I anticipate we'll take

16  those disputed exhibits up.

17             So I'll look for that joint notice of

18  exhibit objections to be filed by 5:00 o'clock on August

19  the 5th.

20             I can refer you to earlier cases where that

21  type notice has been filed if you have any question

22  about the form to be used.  The main thing is I want to

23  be able to look at a -- a single document and see both

24  parties' positions so that it's easy for me to follow

25  what the dispute is.  All right?

1               All right.  With that in mind, we'll next

2    turn to Marvell's motion for partial summary judgment to

3    limit the scope of Lake Cherokee's asserted damage base.

4    This is Document 330, and I'll hear from Marvell on

5    this.

6               MR. CORDELL:  May it please the Court.

7    Ruffin Cordell for Marvell.  It looks like we're --

8    we're closing in on the slides.  There we go.

9               THE COURT:  You may proceed.

10               MR. CORDELL:  Thank you, Your Honor.

11               The -- we -- we are here to -- to argue the

12    motion for partial summary judgment, and at least from

13    our eyes, this began as a fairly straightforward matter.

14    I think overall Lake Cherokee's done a nice job of

15    trying to inject a -- a bunch of different looks, a

16    bunch of different legal principles, but at bottom, what

17    we have is -- is a -- is a fairly simple issue.  Should

18    revenues attributable to extraterritorial acts be

19    excluded from Lake Cherokee's purported damages base

20    where the revenues stem from the transfer of goods

21    manufactured and sold overseas by a non-party?  Now,

22    that's kind of a mouthful.

23               So if I can have the next slide.

24               I actually think it's a little simpler than

25    that.  The reality is, Your Honor, that MSI, Marvell

1    Semiconductor, Inc., is the sole remaining Defendant in

2    this case.  When we began this case, we told Lake

3    Cherokee that you've named the U.S. research and

4    development entity, but you haven't named the sales

5    entity.  Sales entity is called Marvell Asia Pte

6    Limited, MAPL.  And we told them back in December of

7    2011, that if you want to name the sales entity, you

8    need to do that, but these are separate companies.  We

9    respect the corporate forms.  They both are related in

10   that they're both Marvell entities.  But, in fact, it's

11   a separate company.  And we invited them to name them if

12   they so choose -- so chose.

13          For reasons only Lake Cherokee can explain

14   they decided not to do that.  They decided instead to

15   proceed solely against MSI, and they began a series of

16   theories under which they can try to pursue sales by

17   MAPL and -- and have them somehow get taxed to MSI.

18          We -- we heard earlier in the case that

19   perhaps they would pursue an alter ego theory that MAPL

20   wasn't actually it's own separate company, that, in

21   fact, it was just a -- it was just a -- an alter ego --

22   I don't want to use a pejorative term -- for MSI, and

23   that seems to have been abandoned.

24          We also had a fair amount, and I'll discuss

25   this in a little more detail in a moment, a fair amount

1    of -- of work done by -- by Lake Cherokee in an attempt

2    to make out that activities by MSI were the proximal

3    causation of damages overseas, that because there had

4    been design activities or collaboration with customers

5    by -- by MSI, that they would somehow be responsible for

6    those sales.  That theory also seemed to have been

7    abandoned.

8              The good news, I guess, is that this dispute

9    has come down to I think what is a pretty

10   straightforward approach by Lake Cherokee in that they

11   say, well, there are a couple of these master supply

12   agreements and those somehow bind MSI for all of the

13   damages that occurred overseas.  And so I'd like to take

14   those in -- in a little detail as we go forward.

15             If I can have the next slide.

16             It is undisputed that the accused chips are

17   currently and always have been manufactured outside of

18   the United States.  It's also undisputed that virtually

19   all of the accused products were shipped only outside of

20   the United States.

21             Now, what do I mean by that?  There are a

22   certain number of sales that are made by MSI within the

23   United States, and they're shipped into the United

24   States.  And for those, we have -- we have, I think,

25   come to a pretty -- pretty fair agreement about the size

1    of that -- of that royalty base.  But it is a

2    fraction -- a small fraction of what Lake Cherokee is

3    asking in this case, but just --

4              THE COURT:  Is that the approximate 23

5    percent?

6              MR. CORDELL:  It's actually smaller than

7    that, Your Honor.  There are a number of sales.

8              If I can have the next slide, it might be on

9    there.  There we go.

10             99.98 percent of the proposed damages are

11   sales by non-party MAPL, so MAPL is the one who sells

12   the vast majority of these.  However, MSI is that

13   research and development company, and they will provide

14   samples to people that want to test their products or

15   want to collaborate with them.  And so there are a

16   number of products, and there -- there are hundreds of

17   these sales.  It's not -- it's not completely

18   insignificant.  But it takes the damages base,

19   obviously, from something close to a billion dollars to

20   something in the six-figure range, so it's -- it is a

21   significant swing.

22             Even for the sales into the United States --

23   I think the Court talked about the -- the 22 percent

24   number -- I believe that comes from estimates made by

25   Lake Cherokee of the number of products that are sold by

1   MAPL overseas that then are incorporated into hard

2   drives and are somehow imported back into the country.

3   And that might be actionable.  I don't know.  We -- we

4   can debate about how good that data is.  We can debate

5   about how -- how solid Mr. Mills -- their expert's

6   estimates are on that front.

7               But the one that we can't debate is that

8   those products are manufactured and sold by MAPL, so

9   even if -- even if Lake Cherokee wants to garner damages

10  on those -- on those sales, they need to bring in the

11  proper party.  So the fact that -- that MSI and MAPL

12  have common ownership and that they're -- that they're

13  related companies doesn't make MAPL answerable in this

14  lawsuit.  There's still due process rights.  They still

15  have to be named, and they have to be brought into the

16  case.

17              And so at bottom, for those sales, they

18  should have brought MAPL in as a Defendant.  And, again,

19  only Lake Cherokee can explain why they didn't do it.

20              Next slide, please.

21              THE COURT:  Let me ask you this, counsel.

22  The master product supply agreements that are attached

23  as exhibits, they clearly show -- I'm looking at -- I'm

24  looking at Exhibit 1 to Document 350, the Seagate

25  Technology Master Agreement that clearly shows that

1    Marvell is collectively both MAPL and MSI and that they

2    are acting both together as Marvell or the seller in

3    that agreement and that Seagate Technology, LLC, a

4    Delaware limited liability company, and Seagate

5    Technology International, a Cayman Islands corporation,

6    are collectively Seagate.  So the named -- the named

7    Defendant in this case is a original party to the master

8    service agreement in that case and the other cases, are

9    they not?

10            MR. CORDELL:  That is correct, Your Honor.

11    MSI is a named party.  They are jointly named with MAPL,

12    and there are -- there are executory covenants

13    throughout this agreement.  Some are performed by MAPL,

14    some are performed by MSI.

15            THE COURT:  There's not a separate agreement

16    signed by MAPL and not a separate agreement signed by

17    MSI, there's a single agreement they've jointly and

18    collectively entered into, correct?

19            MR. CORDELL:  That is correct.  However,

20    there are purchase orders that are entered for each and

21    every sale.

22            If I can advance a couple of slides.  So

23    here we go.

24            THE COURT:  And I've looked at those, as

25    well.  I know how they're structured.

 1          MR. CORDELL:  Well -- so if I can actually

 2   back up, Ms. Scarpati, I'm sorry.  Back up again.

 3   Really -- I'm frustrated, Your Honor, by my inability to

 4   control it.

 5          The reality is for every single sale of an

 6   accused product, there is a purchase order that

 7   obligates the sale.  This master purchase agreement, if

 8   the Court will look with me at -- I guess it's Paragraph

 9   2.1.

10          Can we go up in the slides?  I think we have

11   a slide on this.  There we go.

12          So when we look at what's actually happening

13   in the -- in the master supply agreements, what we find

14   is that it's a relationship agreement.  It defines the

15   relationship.  It defines how they'll do business.  It

16   defines what kinds of -- you know, they use IncoTerms

17   for -- for some of the agreements.

18          But what it tells us is that, for example,

19   in 2.1, the products and price list indicates, number

20   one, the products that Seagate, or Seagate's contract

21   manufacturer, may purchase from Marvell -- not must, not

22   has to, not might -- well, actually is might -- they may

23   purchase these from Marvell.  And if they choose to,

24   there are a bunch of terms -- there's confidentiality,

25   there's -- the -- the way that they'll treat each other,

1   whether or not there's agency created, all the kinds of

2   things we see in these large master agreements appear

3   here.

4           But then it also says in 2.2 that for each

5   sale, there's going to be a purchase order.  And that

6   purchase order will identify the product being ordered,

7   the quantity of the product being ordered, the price,

8   and Seagate's ship to address and bill to address for

9   that purchase order.

10          THE COURT:  And that's pretty much all those

11  purchase orders show, those limited specifics that then

12  relate back to the master sales agreement?

13          MR. CORDELL:  Well, they do, but there --

14  there are important differences in that the purchase

15  order is where the final pricing is actually determined.

16  So if the Court were to go back and compare the purchase

17  orders to the schedules that are attached to the master

18  agreements, there are often differences, because what

19  happens over time is that the parties' relationship will

20  evolve a little bit, and they'll realize, you know, that

21  perhaps, you know, MAPL is not keeping up with its

22  deliveries, and so Seagate will demand some concessions,

23  and they'll reduce the price for a time.

24          On the other hand, it may be there have been

25  cost savings on one side or the other so the prices will

1    fluc -- fluctuate.

2              So the purchase orders are actually the

3    operative contracts that transfer the goods, transfer

4    title, talk about pricing, talk about quantity, talk

5    about delivery.  All of the essential elements of a

6    contract are contained in the purchase order.  That's

7    not true for the master supply agreements, but there's

8    more.

9              THE COURT:  You know, the purchase orders

10   don't even have a signature on them, counsel.

11             MR. CORDELL:  Well --

12             THE COURT:  They just say it's a printed

13   document, and there's no signature.

14             MR. CORDELL:  They're -- they're signed

15   electronically, I believe, Your Honor.  It -- it says,

16   for example -- I have one here.

17             THE COURT:  Some of the ones I've looked at

18   just say that there's no signature on them because it's

19   a printed document or a computer-generated document or

20   something of that type.

21             MR. CORDELL:  So if I could have the ELMO

22   for a moment, and I apologize, Your Honor, I've gotten

23   ahead of myself, and I'm not exactly sure what exhibit

24   this is.  But it is one of the Seagate purchase orders.

25   And for the record, it's Bates MARV_LC_1455194.

1            Let me get that -- if I can direct the

2     Court's attention to the lower left-hand corner, it

3     says, this is a computer-printed document.  No signature

4     is required.  And so it's --

5            THE COURT:  Exactly.  That's exactly the

6     language I was referring to.

7            MR. CORDELL:  But what it does is it tells

8     us exactly the kinds of transfers that will be made.

9     Using the Western Digital example that I have now that

10    I've got the ELMO up, there are cases where Western

11    Digital purchases product directly from MSI, and so

12    this -- this example of Marvell LC 4919951 shows, in

13    fact, a purchase order from -- from Western Digital to

14    Marvell Semiconductor, MSI, and there's a delivery of --

15    of parts, and I think it goes on about $5,000.00, I

16    believe, if memory serves.  That's $5,000.00 in parts

17    that are ordered and shipped pursuant to this purchase

18    order.

19            That's distinct from the purchase orders

20    that are executed between Western Digital and MAPL.  So

21    this -- this is Marvell LC 4498496 where $508,000.00

22    worth of products are ordered and shipped.

23            THE COURT:  But it's your position that the

24    purchase order, such as you have on the ELMO now, is the

25    sole contract and is separate and distinct from the

1  master purchase agreement which you're saying is not a

2  part of the controlling contract?

3          MR. CORDELL:  It is a part of the contract.

4  I can't dispute that -- that the terms in the master

5  agreement do affect the relationship between the

6  parties, but that's not the questions that we have.

7  There are -- there are dozens of agreements that run

8  between these parties.  There are confidentiality

9  agreements.  There are joint venture agreements.  There

10 are lots of different agreements that might inform this,

11 but when we're looking for what the operative sales

12 contract is, the -- the master supply agreements don't

13 get us there.

14          If I can go back to the slides.

15          We know that because for each and every

16 sale, there's a purchase order and that purchase order

17 includes the essential terms.  The identification of the

18 product, quantity, price, shipping, et cetera.

19          However, you don't have a master supply

20 agreement for every sale.  The converse is not true.

21          So if I can go to the next slide.

22          Well, we had some -- let me just pause for a

23 moment.  We -- we have a bit of deposition testimony

24 that -- that confirms, in fact, there were no sales

25 without purchase orders every single time.

1               And then go to Slide 21.

2               Again, the purchase orders that exist for

3       every single one of the sales.

4               Please continue.

5               It turns out, however, there is not a master

6       supply agreement for all of the sales.  So MSI and

7       MAPL's last supply agreement with its largest customer,

8       Western Digital, expired in June of 2000, very early in

9       the damages period, and that agreement has never been --

10      has never been renewed.

11              THE COURT:  June of 2000 or June of 2007?

12              MR. CORDELL:  Thank you, Your Honor.  I

13      can't read -- I can't read my own slides.

14              But the reality is that was years ago, and

15      there are substantial damages that -- that have accrued

16      that Lake Cherokee is seeking under this master supply

17      agreement theory without acknowledging that, in fact,

18      that agreement has long been gone.  And 40 percent of

19      their damages base is comprised of MAPL sales to

20      Western Digital after that date.  They cannot point or

21      take any comfort in a master supply agreement.  But

22      there's more.

23              THE COURT:  What do you think the effect of

24      this provision in these master supply agreements that

25      is -- for example, in the Seagate case, specifically

1    agree that applicable law will be law of the state of

2    California wherein the other master supply agreement

3    where they agree that the law of New York will be the

4    applicable law?  What -- what impact, if any, do you

5    believe that has as to this issue?

6              MR. CORDELL:  As I read the cases dealing

7    with this extraterritoriality issue, Your Honor, I -- I

8    do see that -- that Courts will sometimes look at a

9    totality of circumstances, and that might be one of the

10   circumstances.  But that's not the one that they

11   normally point to.  They normally point to things like

12   the place of delivery, the place of manufacture, the

13   place of payment, the parties on either side of the

14   transaction.

15             THE COURT:  I've read Transocean, and its --

16   its related cases.  I understand what you're saying.

17             MR. CORDELL:  The -- the reality is we often

18   name -- name a body of law that govern a relationship

19   primarily because we either understand it or both

20   parties sort of take it as a -- as a -- as neutral

21   jurisdiction.  I've had agreements that name French law,

22   name countries outside of the U.S.  So it's not -- I

23   don't think it's dispositive.

24             THE COURT:  Would you agree with me,

25   counsel, that given that there's a clear presumption

1    against extraterritoriality on the damages issue, that

2    when you boil it all down, the issue comes down to do

3    these products harm the patentholder in this country and

4    do they harm the patentholder in this country because

5    those products come into this market and compete against

6    products that are properly licensed, as opposed to

7    products that don't ever come into this country, don't

8    ever impact the value and the rights of the

9    patentholder's intellectual property and, therefore, are

10   not upon properly subject to a damages calculation?

11   Don't you think at the end of the day, that's what this

12   is all about?

13          MR. CORDELL:  I do think that was the focus

14   of, for example, the Power Integrations litigation, and

15   that was tried by one of my partners on the Plaintiff's

16   side, so he tried everything he could to address exactly

17   what the Court was identifying.  It's this motion notion

18   that -- that somehow the patentee had been harmed by

19   these acts.

20          And there, it was a little bit different for

21   two reasons.  Number one, it was a lost profits case,

22   and so the case that Power Integrations was making was,

23   well, regardless of where you made the sales, we had to

24   compete with you because this is a global market, and so

25   when you made a sale in Taiwan, you diminished our

1    ability to -- to maintain our price here because we --
2    we have to compete in a global market.
3              That was rejected by the Federal Circuit,
4    and they said, sorry, whatever acts happened over there
5    happened over there.  We can't read that into your
6    damages here in the States.  But there was another
7    significant difference, and that is in Power
8    Integrations, they had an inducement claim, and so they
9    were -- they were arguing that the Defendant had induced
10   infringement in the States and that that also caused
11   damage overseas.  That's not true here.  There's no
12   inducement claim here.  There's no offer for sale claim
13   here.
14             THE COURT:  Is there a claim of indirect
15   infringement?
16             MR. CORDELL:  No.  That has been waived, I
17   believe, in the pre-trial order.  It's -- it's been
18   taken out of the case, which is -- which is an important
19   distinction.
20             But I -- getting back to the Court's
21   fundamental question, yes, we -- we want the patent laws
22   to protect patent rights.  We want people to -- to honor
23   those.  We want them to do it, but we also want due
24   process to come into it such that if Lake Cherokee feels
25   like it's being damaged by MAPL sales overseas that are

1   being imported into this country, there are remedies for

2   that.  But they're -- they lie against MAPL.  They don't

3   lie against MSI.

4              There are -- you know, I hate to give my

5   opponents ideas, but the International Trade Commission

6   will stop imports of those kinds of things.  There are

7   different ways you can deal with the exact precise harm

8   that I think the Court identified that don't require us

9   to -- to disregard the corporate forums and to hold

10   accountable a sister company for the acts of its

11   overseas affiliate.  Again, that's just not in the law.

12             And -- and the Court is exactly correct,

13   there is a presumption against extending the reach of

14   U.S. law extraterritoriality.  There's got to be some

15   compelling interest in the cases that tell us that --

16   that would justify that kind of departure.  And we just

17   don't see it.  We don't see it in Power Integrations.

18   Again, my partner tried, I think, everything he could to

19   try to extend that breach and was -- as told no.

20             THE COURT:  What else, counsel?

21             MR. CORDELL:  Just a couple of other quick

22   points.  So I talked about the Western Digital agreement

23   expiring in 2007.  The master supply agreement between

24   MAPL and Seagate had expired between 2005 and wasn't put

25   back into place until 2008.  Again, a large number of

1    sales happened during this where the only document were

2    the purchase orders.

3                    Next slide.

4                    We also have the fact that the master supply

5    agreements don't reach all of the products that are

6    accused.  So there is a -- there is a product list

7    attached to the master supply agreements, but it is a

8    subset of the accused products in this case.  And so for

9    specific models of -- of the accused products, there

10   will be no master supply agreement.

11                   Next slide.

12                   However, there will be a purchase order.

13   And at Slide 25, Your Honor, we -- we list out the

14   particular products that the master supply agreements --

15   this one is -- is the Seagate example, that -- that

16   reach -- and yet this is a small subset of the products

17   that are actually accused in this case.

18                   And so when Lake Cherokee stands up and

19   says, well, wait a minute, this master supply agreement

20   is what really governs it, they have to answer to the

21   fact that it's been out of -- out of force for years,

22   big hiatus period, and that it doesn't reach all the

23   products for which there is a purchase order, one

24   between MAPL and Seagate for each and every one of these

25   sales.

1          Next slide.

2          And I -- I won't take the Court -- the Court

3    is clearly familiar with the cases here, but the reality

4    is that what we -- what we should be focused on is where

5    the fundamental aspects of the contract take place, the

6    identification of the products, the pricing, the

7    delivery, the -- the specification.  Those are the kinds

8    of things that ought -- ought to be the focus, and here

9    it is the purchase orders.  That is the first time where

10   a party is obligated to take a product and a party is

11   obligated to supply the product and the name of the

12   contract provided.

13         So with that, if there are any other

14   questions, I'll cede the podium.

15         THE COURT:  No.  Now, as I understand it,

16   there's also a part of this motion that has to do with

17   the issue of marking.  Do you want to address that?

18         MR. CORDELL:  Well, I was going to have one

19   of my partners do that, Mr. Colaianni.  Would the Court

20   prefer that, or should we --

21         THE COURT:  Well, if you're not prepared to

22   address that now, then I'll hear the Plaintiff's

23   response to the extraterritoriality, and then we'll take

24   up the marking next.

25         MR. CORDELL:  Thank you, Your Honor.

1            THE COURT:  Let me hear from the Plaintiff.

2            MR. DOVEL:  Your Honor, we're here on

3    summary judgment which means we're here on a factual

4    record based on the evidence that's been submitted.  In

5    their reply, Marvell said that they are not disputing,

6    for purposes of this motion, any of the facts that we've

7    set forth in our opposition that we've supported with

8    evidence.  And those facts are very different than what

9    Marvell was just arguing, Your Honor.

10           None of the sales are made by MAPL.  In

11   fact, in the factual record on this motion, Marvell

12   itself did not pre -- present any evidence that a sale

13   was made by MAPL.  The sales entity for all the sales is

14   MSI.  That's why we sued MSI.  It's the sales entity,

15   not MAPL.

16           All of the chips are sold pursuant to a

17   requirements contract.  That's Fact 9.  It's -- it's

18   several facts that go together, but Fact 9 sort of

19   captures that.

20           Your Honor, there are master supply

21   agreements that -- for a portion of the chips, and what

22   happens is early in a relationship, for example, with

23   Western Digital, the parties are getting to know each

24   other.  They do this formal written long form agreement.

25   But that long form agreement is only putting down in

1  writing in a long format what they've already agreed to,

2  which is they've agreed upon the chip that's going to be

3  sold, the specification.  That's a long process.

4  They've negotiated and agreed upon the price.  And then

5  they would do that long form.

6           But in all cases, even when they didn't do

7  the long form, they did reach agreement on

8  specification, price, and that the quantity would be

9  the requirements of Marvell.

10          One thing that Marvell -- left out of

11 this -- this whole notion here is that these are not

12 simple contracts where it's we're going to sell you a

13 hundred units.  Here they are.  The contracts in every

14 single case are requirements contracts.  We've got

15 undisputed testimony on that, Your Honor.  In every

16 single case, Marvell was awarded a design win after it

17 reached agreement on specification and price, meaning

18 that Marvell had agreed to provide all requirements for

19 that particular hard drive product and the hard drive

20 maker had agreed to purchase all requirements from

21 Marvell.

22          So at that point, there was a binding

23 contract.  And, again, some of those were reduced to

24 formal -- long form documents, and each one of them,

25 they, again, say this is a requirements contract.  It's

1   not, well, we might buy some.  You know, Seagate or

2   Western Digital was required to buy all chips for that

3   product.

4              The number would be determined in the

5   future, which is the -- the nature of a requirements

6   contract.  And how is that number determined?  Those

7   were the purchase orders.  The purchase -- purchase

8   orders are fulfilling the requirements contract.

9   They're fulfilling orders.  Hey, we need a thousand of

10  them, we need 10,000 and so on.  The price would be the

11  price that had been agreed upon unless the parties then

12  negotiated a different price, and the -- the pattern and

13  the habit, the custom in this industry was the price

14  negotiations would happen approximately every quarter,

15  and the price would go down over time.

16             But even those agreements were reached with

17  MSI, not MAPL.  The key fact, Your Honor, is that all of

18  the sales activity was performed by MSI, or

19  substantially all of it, and it was all performed by MSI

20  in the United States.  And what the cases require is

21  that we have essential sales activity in the U.S.  And

22  that's the holding of the MEMC case, the Federal Circuit

23  2005.

24             In that case, Your Honor, there was product

25  that was delivered overseas.  It was manufactured

1   overseas.  The Federal Circuit didn't say, well, that's

2   enough, therefore, delivered overseas, sold overseas,

3   there's no sale in the U.S.

4          What the Federal Circuit reasoning is -- its

5   fresh reasoning was that the delivery overseas is not

6   sufficient to preclude there from being a sale in the

7   forum.  Delivery outside the forum is not sufficient to

8   preclude sale inside the forum.  And they said, we have

9   to, in addition, determine whether there were any

10  essential sales activities, and they specifically

11  identified agreement on price and negotiation of price.

12  Was agreement on price, negotiation of price done in the

13  United States?

14         In that case, only because -- and this is

15  the language of the Federal Circuit -- all essential

16  sales activities was outside the United States, the

17  Court then could conclude that there was no sale in the

18  U.S.  But the Court in its express reasoning -- that's

19  its holding -- was that a delivery outside of the U.S.

20  was not sufficient to keep it out.  We've got to look at

21  activity within.

22         And five District Courts that have

23  considered this issue after that have all reached the

24  same -- same conclusion that there can be a sale in the

25  U.S. even though the product never reaches the United

1    States.  It depends whether that those essential sales

2    activities happened in the U.S.

3              THE COURT:  Talk to me, counsel, about the

4    distinction made in the briefing as to these chips that

5    are manufactured outside the United States, sold and

6    delivered outside the United States, but talk to me

7    about the then fork in the road where a portion of them

8    find their way into products that are then sold back

9    into the United States market and the other portion find

10   their ways into products that are never sold back into

11   the United States market.

12             To the extent the Court views that as an

13   important distinction, how do you intend to prove to the

14   jury in this case which portion of these chips come back

15   into the United States and compete against the

16   patentholder's rights, as opposed to that portion that

17   never come back into the United States.

18             MR. DOVEL:  That will be the opinion of our

19   expert opinion, Mr. Mills, who's done an analysis to

20   come up with a very reliable estimate of percentage.

21   What he did was go out and get data from the customers

22   of Marvell -- that's the immediate customers and

23   downstream customers -- on the percentage of products

24   that were imported into the U.S. by product segment, and

25   then use those percentages, applied them to Marvell's

1    chips to come up with the overall percentage.  It's a

2    slight underestimate.  There are certainly more chips

3    that are imported.  It's more than -- I think the number

4    they came up with is around 25 percent.  It's probably

5    closer to 40, but he used the -- the data that he had to

6    identify at least 25 -- at least 25 or 27 percent come

7    into the U.S.  So that will be done with expert

8    testimony, Your Honor.

9              THE COURT:  How -- how do you argue that MSI

10   is the seller of these products, as opposed to MAPL when

11   the purchase orders fairly uniformly reflect that the

12   purchase order -- not the master sales agreement, but

13   the specific purchase orders is placed by Seagate,

14   Western Digital, whoever, with MAPL, as opposed to MSI?

15             MR. DOVEL:  Your Honor, the purchase order

16   is not the sale.  The sale occurs when the parties have

17   reached agreement on what is the thing we're going to be

18   selling, what's its price going to be, and are you going

19   to be providing all chips?  Is this going to be a

20   requirements contract?  When you've reached agreement on

21   those three things, we have a contract of sale.

22             THE COURT:  So in other words, you want me

23   to focus on the master sales agreement and not focus on

24   the purchase order, and opposing counsel wants me to

25   focus on the purchase order and not focus on the master

1    sales agreement?

2              MR. DOVEL:  I think that's right, Your

3    Honor.  The purchase orders --

4              THE COURT:  And the Court believes they're

5    both important.

6              MR. DOVEL:  They're important, but let me

7    explain, Your Honor, the relationship between the two.

8    And this is all from the Marvell -- this is Marvell's

9    witnesses, Marvell's testimony, Marvell's documents.

10             The sales process is the process that I

11   described, and then they have the fulfillment of the

12   contract.  It's -- if I was going to buy something, you

13   know, for example, online, I -- I picked out what I

14   wanted to buy, I gave them my credit card information.

15   At that point, we've got the sale.

16             And then there's something called product

17   fulfillment, and that is simply the shipping of the

18   product to the party.  And that's all that MAPL is

19   involved with.  It's called product fulfillment.  And

20   even the fulfillment of the purchase orders, Your Honor,

21   is controlled by MSI.  It's under the management --

22   direct management of MSI's sales force.

23             So although the -- the purchase order is a

24   factor to be considered, it's not a contract.  The

25   contract of sale occurs much earlier, and the evidence

1  we've submitted -- and I think it's probably going to be

2  undisputed is that in every single case, there is no

3  purchase order unless there has been previous to that a

4  contract of sale, that is, an agreement on per -- on

5  price, terms, and a -- and a commitment to a

6  requirements contract in every single case.

7            Now, they point out that there's a purchase

8  order -- purchase orders that are made to MSI directly.

9  Those are not production purchase orders, Your Honor.

10 Those are purchase orders that are done for test chips

11 that are part of the sales process.  In other words, MSI

12 is going to provide to the customer some samples of the

13 chips so that they can test them to verify that these

14 are what they want to buy.  That's what those are about.

15 It's after that point that they then reach agreement on

16 the price for production and they get the commitment to

17 a requirements contract.  And at that point, they have

18 an agreement under Federal Circuit law, Your Honor.

19            THE COURT:  How do you then respond to

20 language like that used by the Federal Circuit in the

21 Transocean opinion where they cite the Litecubes' case

22 and say -- referring to Litecubes, there we held the

23 sale does not occur -- does not only occur in a single

24 point where some legally operative act took place.  We

25 may also consider other factors, such as the place of

```
1  performance.  It sounds like both of you are wanting me
2  to look at one particular place, be it the purchase
3  order on the one hand or the master sales agreement on
4  the other hand and say, ah-ha, that's where the sale
5  took place.
6          MR. DOVEL:  Here's the distinction, Your
7  Honor.
8          THE COURT:  It looks like to me it is a
9  totality of the facts and the operative context, not
10 just a single point.
11         MR. DOVEL:  You're right, Your Honor.  It's
12 the totality, and it's not a single point.  But there's
13 an important distinction.  What the Federal Circuit
14 looks at is are there sufficient -- is there sufficient
15 sales activity in the U.S.?  In other words, it's not
16 the case that you have to have the same test every time.
17 There are different sets of facts that can happen in the
18 U.S. that will give rise to a U.S. sale.
19         So it's true that we look at negotiation,
20 price, agreement, fulfillment of the purchase orders,
21 place of delivery, we can look at all those things.  And
22 the test that the Federal Circuit was emphasizing in
23 Litecubes is if any of those is a sufficient amount of
24 activity in the U.S., that is enough to give us a sale.
25 If we just have the buyer in the U.S., that gives us a
```

1    U.S. sale.  If there's just delivery in the U.S., that

2    gives us a U.S. sale.  If there is agreement on price in

3    the -- in the U.S., that gives us a U.S. sale.  We can

4    look at that totality, but sale happens at several

5    places.  When you have a sale, part of the sales

6    activity's in the U.S., part of it's in Singapore, part

7    of it's in Taiwan.  We have sales activities several

8    places.

9              And the test with the -- under the

10   Litecubes' case is, is there sufficient activity here?

11   The sale happens in more than one place, and as the

12   Litecubes' Court held, in that case, it did happen in

13   that particular forum, but not necessarily only there.

14   If the facts had been reversed, it still would have been

15   a U.S. sale.  In other words, we don't need delivery.

16   We don't need negotiation.  We can have either one.

17             THE COURT:  Let me ask you this, counsel?

18   My reading of your complaint indicates that you had

19   allegations of induced infringement.  What -- what live

20   theories of infringement are before the Court at the

21   time of trial?  Is there a live claim for inducement?

22   Is there an indirect infringement allegation?  Is it

23   solely a direct infringement case?  Tell me how this

24   case is postured at this juncture as we get ready to

25   pick the jury?

1          MR. DOVEL:  Your Honor, it's a direct

2    infringement case.  It's about selling the accused

3    chips, which is an act of direct infringement, act of --

4    they sell the accused chips.

5          THE COURT:  So it's a direct infringement

6    case only?

7          MR. DOVEL:  Yes, Your Honor.

8          THE COURT:  Only?  That's what you're

9    telling me?

10          MR. DOVEL:  Yes, Your Honor.

11          THE COURT:  Okay.  What other argument do

12    you have for me on this motion?

13          MR. DOVEL:  I think I've addressed the

14    arguments that were made by Marvell.  Unless you have

15    any other questions, submit.

16          THE COURT:  All right.

17          MR. CORDELL:  Brief rebuttal, Your Honor?

18          THE COURT:  Yes, Mr. Cordell, go ahead.

19          MR. CORDELL:  So I -- I -- I think the Court

20    has -- has got the -- you know, has got the dispute

21    squarely in front of it.  They say it's the master

22    supply agreements.  We say it's the purchase orders.

23    And there -- there -- I can imagine there could be an

24    analysis where we go through and we sort of award points

25    and weigh each one.  But we can't get away from the

1    fundamental fact that although Mr. Dovel says it's a

2    requirements contract and that there are all these

3    things that are shipped, we can read that Seagate

4    agreement until our eyes fall out, and we won't be able

5    to determine what quantity of the products are to be

6    shipped.  We won't be able to determine even the

7    characteristics of the product because that agreement

8    anticipates that they will go off and develop new

9    things.

10          There are provisions in that agreement for

11   collaboration where they test new designs and they're

12   putting new things in place.  So it's not only a

13   question that we don't know how many or what the real

14   price is.  As Mr. Dovel said, they -- they adjusted the

15   price continuously through the relationship.  We don't

16   even know what products are being delivered.

17          So to call it a requirements contract, at

18   least in my view, is a huge stretch because it doesn't

19   say that Seagate will hereby buy everything it ever

20   needs in the future from Marvell.  It says under certain

21   circumstances, it will take certain capacity if it gives

22   MAPL the -- the -- the heads up that it's going to

23   require these kinds of things, and there's lots of ifs

24   and ands in there.

25          But I -- I would challenge Mr. Dovel to

1    point to a place in the contract that says that there

2    will be 600,000 units per month delivered.  It's not

3    there.  It's not there.  Because the process anticipates

4    that the purchase orders are the actual mechanism for

5    moving the goods.

6              The -- he -- he also gave his comments about

7    the MEMC case, which I -- I kind of like because the

8    Court in MEMC finds that there were no extra -- I mean,

9    there were no U.S. sales.  They found it -- they found

10   essentially for the party in Marvell's position there,

11   despite the fact that there was activity in the States,

12   despite the fact that there were meetings in Austin, and

13   going back and forth.

14             Much of the issue in the MEMC case had to do

15   with whether or not there was an act of direct

16   infringement.  It doesn't exactly speak to the same

17   damages issue in quite the same way.

18             But they looked at those kinds of factors,

19   but MEMC says, you look at where the product was

20   delivered.  You look at where the pricing was finally

21   agreed upon.  Those are the kinds of -- of factors that

22   MEMC values, and we -- we would agree with that.

23             The -- and just if I -- if I can just show

24   one more slide which I -- which I neglected to do, which

25   is the Halo Court.  Power Integration's trod this

1    ground, Your Honor.  It was -- it was four square

2    evaluating where and when we could take extraterritorial

3    sales and -- and bring them in.  And came out that, as

4    the Court pointed out, the statute says that they --

5    these acts have to be in the United States.  The statute

6    presumes that we're only going to find redress for --

7    for U.S. acts.

8              And the Halo Court followed -- the Halo

9    Court, I'm sorry -- Halo applies Transocean, and the

10   cases that Lake Cherokee cited and found no liability

11   specifically looking at the purchase orders issued,

12   looking at the fact that at no point in transit or

13   otherwise did these products make it into the United

14   States.

15             Mr. Dovel, I think, correctly pointed out

16   that, yes, there are products that might make it here

17   through the actions of -- of MAPL's customers who will

18   incorporate them into hard drives and they may be

19   imported.  We dispute how good that evidence is because

20   nobody really was able to get to the bottom of that, I

21   think, in discovery with the third parties.

22             But the reality is if that is an act of

23   infringement on -- for example, I'll pick on Hitachi

24   since they're licensed and they can't -- they can't

25   infringe, but if that was an act of infringement, it

1    would be Hitachi who would answer for that act of

2    infringement.  They would be the ones who are importing

3    and using and selling in the United States an allegedly

4    infringing the article, not MAPL, not MSI.

5              And so when Power Integrations talks about

6    the fact that you may have had a territorial action some

7    time in the past, these manufacturer and sales

8    activities overseas cut off any liability.  You can't

9    reflect that back to the designer of the product, for

10   example, and claim that that creates liability.

11             If I could have that slide.  I have a quote

12   from Power Integrations.  Actually one more.  Thank you.

13             Yeah, Power Integrations has not cited any

14   case law that supports an award of damages for sales

15   consummated in former -- foreign markets, regardless of

16   any connection to infringing activity in the United

17   States.

18             The point is that -- that these downstream

19   acts cut off whatever liability they think could have

20   been associated with MSI, and they've been unable to

21   address that.

22             And then one last point in that it has

23   always been -- been within Lake Cherokee's power to

24   avoid this issue.  They could have brought claims

25   directly against MAPL had they so chosen and they -- we

```
1    would have had a very vigorous debate about the actions

2    of MAPL.  We would have had MAPL's witnesses and had

3    them here before us.

4              But Lake Cherokee chose to do that.  They

5    don't have an indirect case.  They've got to prove

6    precise acts of infringement within the United States,

7    and that they simply can't do.

8              THE COURT:  All right.

9              MR. DOVEL:  Your Honor, briefly?

10             THE COURT:  Thank you, counsel.

11             I'll give you -- I'll give you a brief

12   response.

13             MR. DOVEL:  Your Honor, the Power

14   Integrations case is about stipulated sales that took

15   place in the U.S. and whether those could have caused

16   other sales outside the U.S.  Here, all the sales that

17   we are accusing are sales in the U.S.  We are not

18   seeking to then get sales that took place outside the

19   United States, based upon sales in the U.S.  Every sale

20   that we are accusing was closed, consummated, done in

21   the U.S.  So there's not an issue about any cutting off

22   of foreign activity.

23             The act of a sale, the act of manufacturing,

24   the act of using, and the act of importing are four

25   separate infringing acts.  It's binding Federal Circuit
```

1   law.  The sale takes place by one actor.  The

2   manufacturing by a different actor.  The use by a

3   different actor.  The importing by another one.  Each

4   are separate infringing acts.  A sale all by itself is

5   an infringing act.  It doesn't require delivery of the

6   product, use of the product, or importing it.

7          Thank you, Your Honor.

8          THE COURT:  All right.  Well, the Court's

9   considered this issue at length and carefully read the

10  briefing of the parties on this point.  And having heard

11  the argument, the Court's ruling on this is as follows:

12          The Court finds that as to that portion of

13  the product and the sales at issue in this case, which

14  without question never entered the United States market,

15  that being those products that were manufactured and

16  delivered outside the United States, placed into

17  finished products of other companies, be it Seagate,

18  Western Digital, or whoever, and those products never

19  entered the stream of commerce in the United States,

20  that the presumption against extra --

21  extraterritoriality applies and that those sales do not

22  constitute infringement under Federal Law Section 271.

23  And those are going to be excluded in this trial as a

24  part of the base of the damages asserted by the

25  Plaintiff.

1              However, as to that portion of these sales

2    that do find their way back into the United States and

3    do compete with and potentially harm the holder of the

4    patents-in-suit, the Court finds that there are existing

5    questions of fact there that preclude at this juncture a

6    granting of summary judgment.  And the Court will allow

7    that portion, be it 22, 23 percent, whatever the

8    evidence shows, as being the base for damages in the

9    Plaintiff's case during the trial.

10             And the Court will listen carefully to the

11   evidence on these matters through the trial, and at the

12   end of all the evidence, I'm sure there will be motions

13   for judgment as a matter of law.  And at that point, the

14   Court will have much better guidance as to the surviving

15   issue as to that 22, 23 percent that comes back into the

16   United States and as to whether that's properly

17   submittable to the jury or not.

18             At the end of the day, the statute in

19   question is about protecting against harm to holders of

20   United States patents.  And where that product is sold

21   and comes back into the market of the United States and

22   takes sales away from or potentially harms the holder of

23   those patents, then I believe the spirit of the law is

24   to provide a means to protect that patentholder.  But

25   where those sales are generated such that the product is

1  manufactured, delivered, and sold, never coming into the

2  United States market, the Court sees no viable means to

3  get beyond the prohibition on or the presumption against

4  extraterritorial damages because in those cases, the

5  holder of the intellectual property is not subject to

6  harm or injury because the rights protected by that

7  patent are not competed against when those products

8  never entered the stream of commerce in this country.

9           So for those reasons, the Court grants the

10  motion for summary judgment as to the portion clearly

11  not entering the stream of commerce in the United

12  States.

13           As to the portion that does enter the stream

14  of commerce in the United States, the Court finds that

15  there are surviving material issues of fact that

16  preclude the granting of summary judgment at this

17  juncture, and the Court denies the Defendants' motion

18  for summary judgment in that regard.

19           All right.  With that ruling, I'll take up

20  the argument on the marking issue.  And I'll hear from

21  the movant on that.

22           MR. COLAIANNI:  Good afternoon, Your Honor.

23           THE COURT:  Good afternoon.  You may

24  proceed.

25           MR. COLAIANNI:  Joseph Colaianni for

1   Defendant Marvell Semiconductor, Inc.

2            There is a portion of MSI's summary judgment

3   motion that deals with marking.  And there -- this

4   portion of the motion deals with Marvell's motion to

5   limit the scope of Lake Cherokee's asserted damages

6   base -- based on -- in part, on Lake Cherokee's failure

7   to mark.  In effect, it seeks to limit the damages to

8   only post-suit damages.

9            THE COURT:  I understand that, and I

10  understand it's the conduct of Lake Cherokee's

11  predecessors in title that's at issue.

12           MR. COLAIANNI:  That's correct, Your Honor.

13           This motion, as -- as the Court is aware, is

14  closely related to a motion in limine that Lake Cherokee

15  filed which seeks to prevent Marvell from entering any

16  evidence relating to a failure to mark defense.  And I'm

17  happy to address the issue relating to the motion in

18  limine, as well, now if that would be the Court's

19  preference, or we could do that separately.

20           THE COURT:  No.  What I want you to address

21  for me is why Marvell never raised this in its responses

22  to interrogatories until a supplemental answer was given

23  months after the close of discovery in this case, and

24  for the first time only then raised the complaint about

25  a failure to mark.

```
 1              MR. COLAIANNI:  Yes, Your Honor.  This issue
 2    arose with -- well, the issue began with the answer of
 3    the complaint.  Marvell in its answer to the complaint
 4    stated that it intend -- that it claimed limitation on
 5    the statutory damages based on Sections 286 and 287
 6    which deals with marking.  This was -- this was pled as
 7    an affirmative defense in -- in the answer of the
 8    complaint back in 2010.  Lake Cherokee --
 9              THE COURT:  I didn't ask you about the
10    complaint or the answer to the complaint.  I asked you
11    about the answer to the interrogatories.
12              MR. COLAIANNI:  Yes, Your Honor.
13              THE COURT:  Where you reversed the right to
14    respond later and then responded after the close of
15    discovery for the first time addressing the marking
16    issue.
17              MR. COLAIANNI:  Yes, Your Honor.
18              In response to Lake Cherokee's Interrogatory
19    No. 18, this was the interrogatory which Lake Cherokee
20    sought contentions from MSI relating to the marking that
21    was raised in -- in the answer.  We originally answered
22    that interrogatory through -- by objecting, and we --
23    the reason for the objection -- the basis for the
24    objections were that this is a burden -- mark -- this
25    mark is an issue.  It's Lake -- it's Lake Cherokee's
```

1    burden as the patentee to lay out the facts relating to

2    marking.  It has the burden to show for the period of

3    damages upon which it seeks -- the period of time on

4    which it seeks damages that it, in fact, marked, if it

5    had an obligation to mark.  This is -- this is not a

6    defense in the sense that it's a burden of the

7    Defendant.  It's Lake Cherokee's burden if it's seeking

8    damages over a period of time.

9            THE COURT:  As I read the interrogatory,

10   counsel, it asked you to respond to the issue of marking

11   and did you believe marking was an issue in this case.

12   It didn't ask who had the burden of proof.  It clearly

13   asked you to identify, as proper discovery does, what

14   are the -- what are the operative issues and disputes in

15   this case.  And your client opted to not substantively

16   respond to that question until an amendment long after

17   the close of discovery when the Plaintiff was then

18   unable to pursue development of your response -- your

19   amended response, through the discovery process.

20            And quite honestly, I find that that is an

21   attempt to lay behind the log on the part of Marvell and

22   that it would, if allowed, cause substantial and

23   unjustified prejudice to the Plaintiff, and I'm going to

24   deny the motion for summary judgment based on a late

25   answer after the close of discovery which has a clear

1   prejudicial effect.

2              I'm not going to debate with you who does

3   and doesn't have the burden of proof.  I think you

4   forfeited the right to urge this because of the way you

5   acted during the discovery process.  And I'm going to

6   strike the failure to mark as a defense to pre-suit

7   damages by the Defendant in this case.

8              And I don't need any more argument on that.

9   I understand what happened here.  That's my ruling.

10             MR. COLAIANNI:  Thank you, Your Honor.

11             THE COURT:  All right.  Next, let's take up

12   Marvell's request -- well, we have a pending request for

13   Marvell for a hearing on the royalty base, or in the

14   alternative for a motion on the bench trial.  It appears

15   to me that that may now be in large part moot by what

16   the Court's ruling has been on the prior summary

17   judgment.

18             Counsel, you still believe this is an issue

19   I need to take up and hear argument on?

20             MR. CORDELL:  Just briefly, Your Honor.

21   Ruffin Cordell for Marvell.

22             The -- the Court mentioned that it would

23   like to hear the evidence as it comes in during the

24   trial to -- to provide any further rulings on the -- on

25   the 22 percent.  That's -- that's certainly a viable

1  approach.

2            THE COURT:  I -- I listen to all the

3  evidence during the trials.  That's what I'm here for.

4            MR. CORDELL:  The -- you know, the bench

5  trial, we thought, might be a -- might be a creative way

6  to deal with that issue.  But the Court always holds the

7  power to -- to make these rulings.  So it's -- it's

8  really at the discretion of the Court.  We still believe

9  it's a good idea, but we understand with the schedule,

10  that that might be difficult.

11            THE COURT:  I think in light of the facts,

12  particularly the Court's prior ruling, this is something

13  that will naturally flow through the trial of the

14  case-in-chief, and there's no need for a separate bench

15  trial.  To the extent this is still a live motion and

16  not mooted by my prior ruling, I'm going to deny the

17  application under this pending motion.

18            All right.  That brings us to first the

19  first of several Daubert motions.  We're going to take a

20  10-minute recess, and then we'll come back and take up

21  the next matter, starting with the Daubert motion on

22  Robert Mills.

23            The Court will stand in recess.

24            COURT SECURITY OFFICER:  All rise.

25            (Recess.)

```
 1                    COURT SECURITY OFFICER:  All rise.

 2                    THE COURT:  Be seated, please.

 3                    All right.  We'll next take up Defendant

 4       Marvell's Daubert motion regarding Plaintiff's expert

 5       Robert Mills, and I'll hear from the movant Defendant in

 6       that regard.

 7                    MR. CORDELL:  Thank you, Your Honor.  Ruffin

 8       Cordell for Marvell.  May it please the Court.

 9                    So we are here to talk about the Daubert

10       motion with respect to Mr. Mills -- if I can have the

11       next slide.

12                    The Court is -- is certainly very familiar

13       with the standards here.  I'm not going to belabor that.

14       But the reality is that the thing that marks Mr. Mills'

15       analysis is that he has -- he has a great deal of real

16       world evidence at his disposal.  He's got a number of

17       agreements.  He's got sales agreements.  He's got

18       license agreements.  He's got technology agreements.

19       And he rejects it all in favor of -- we'll call them

20       novel theories where he -- he labors mightily to try to

21       find a substitute for this real world evidence.  And

22       that simply doesn't meet the Daubert standard.

23                    Next -- next slide, please.

24                    So his -- his damages demand was 858

25       million.  It will come down substantially based on -- on
```

1   the Court's ruling.  But the thing to focus on here is

2   that 8 percent royalty.  In my experience doing

3   electronics cases, I have never ever seen a royalty this

4   high.  He has set a new record for me at least.

5             THE COURT:  Is that supposed to form a basis

6   for my motion -- my ruling?

7             MR. CORDELL:  If it would, Your Honor, I'd

8   be -- I'd be honored, but -- but the reality is that I

9   think -- I think Mr. Mills knows this, too.  And I think

10  that this is a product of -- of true results-oriented

11  analysis.  He -- he was trying to get to high numbers,

12  and -- and he did.

13            There -- he -- his methodology really

14  devolves two methods.  One brought him to 37 cents a

15  chip, the other one 41 cents a chip.  But as I

16  mentioned, neither really based on real world

17  evaluations.

18            Next -- next slide, please.

19            He -- he chose to ignore -- he looked at

20  dozens of agreements in this case.  He looked at

21  agreements between Lake Cherokee and several companies.

22  He looked at agreements between the prior patentholders

23  and several companies.  He looked at agreement with

24  Marvell and several companies.  And remarkably, not a

25  single one of them formed his analysis.  He was able to

1    reject every single license, sale, or technology

2    agreement.  So we'll -- we'll spend some time talking

3    about that.

4              Number two, he -- he -- he doesn't do any

5    apportionment here.  We've been told repeatedly by the

6    Federal Circuit in Microsoft, in Uniloc, in

7    LaserDynamics that apportionment is -- is absolutely

8    required, unless you can -- you can prove up the entire

9    market value rule.  There's no issue of EMV here, so he

10   needed to do the apportionment.

11             And then, finally, he -- he doesn't -- he

12   doesn't go into the smallest salable unit, and I'll

13   show -- I'll show the Court that.

14             Next -- next slide.

15             So let's start with the real life

16   transaction.  And the Court's seen some of this in our

17   briefings, so I won't belabor it.  But the reality is in

18   2004, with the -- the hypothetical negotiation was just

19   a few years before this, and there was a sale by Cirrus

20   Logic to Broadcom of 36 patents, including those in

21   suit.  And, Your Honor, if I might pause for a moment

22   and ask my colleagues.

23             Some of this may be confidential?  No?

24   Okay.  They took care of it.  My apologies, Your Honor.

25   I'm clear, violating the protective order is a bad idea,

 1   so I'll try to prevent that.

 2            36 patents, including these two for 18

 3   million in 2004.  So that's proximal to the hypothetical

 4   negotiation date and included 36 patents.  So one of the

 5   things that I found remarkable about -- about Lake

 6   Cherokee's briefing is they suggest, well, the sale of a

 7   patent can often be less than the price of a license.

 8   And I -- I'm -- I'm fascinated by that economic theory

 9   that I could get a -- rights just to practice a little

10   part of the patent grant and pay more than buying the

11   whole thing outright.  It defies logic.  It defies the

12   case law.

13            THE COURT:  Sounds like a good question for

14   cross-examination.

15            MR. CORDELL:  It -- it -- it would be.  It

16   would be.  I was hoping the Court would put it to

17   opposing counsel, as well.  I don't want to leave that

18   on the table.

19            I lost it.  Is it confidential?

20            My apologies, Your Honor.

21            THE COURT:  I'm happy to listen to your

22   argument without your PowerPoint presentation.

23            MR. CORDELL:  Yeah.  Actually, I can't tell

24   my kids bedtime stories without PowerPoint, so it's a

25   flaw.  There we go.  So we've taken out the confidential

```
1    information.
2              There was a sale by Broadcom to Lake
3    Cherokee.  The Court knows these numbers.  Again,
4    that -- that marks what should be the absolute upper
5    bound of -- of any valuation in this case.
6              Next slide, please.
7              There were prior licenses in this case.  So
8    the Court is aware that LSI was a Defendant.  LSI is
9    Marvell -- Marvell's principal and really only
10   competitor in the re -- read channel market.  And they
11   were a Defendant in this case.  Their products were
12   accused of infringement side-by-side with Marvell's.
13   Their expert analysis went hand and glove with the
14   analysis with Marvell.  And yet, despite the fact that
15   it was exactly these patents in this suit and it was
16   exactly this technology, it was exactly this market, it
17   was exactly these customers, Mr. Mills finds that it's
18   not relevant.
19             Now, I understand that -- that it was a
20   settlement agreement, and he may -- he may reject it on
21   that basis, but we'll have a -- we'll have a fight
22   about that, I suppose.  But as the Court pointed out,
23   that's -- that could be the subject for testimony.  If
24   Mr. Mills felt like this was -- this was a -- that the
25   settlement agreement is inappropriate because he had
```

1   substantive reasons to do that, he can explain that on

2   the stand.  But that doesn't mean that he shouldn't

3   consider it because, again, as we found out in ResQNet

4   and the legion of cases that followed, that oftentimes

5   these settlement agreements are the best valuation of

6   the technology because the technology is the same.  We

7   don't have to get into debates about whether or not the

8   read channel product is similar to say, for example, the

9   ARM core that we'll talk about in a moment.  It will

10   lose that entire debate.  We don't have to talk about

11   whether these patents are sufficiently similar to others

12   that have been licensed in the field because it's the

13   same patents.  And so as a valuation methodology, it

14   really is compelling evidence.

15          We also have the license between Lake

16   Cherokee and Hitachi to 18 patents, including the

17   patents-in-suit.  And, again, the number is in the

18   briefing.  But the reality is it's far, far less than

19   what Mr. Mills is asking for.  And so rather than

20   dealing with it on the merits, he simply turns a blind

21   eye to that evidence and that violates.

22          Next slide.

23          This Court has recognized that oftentimes

24   licenses relating to the same patents-in-suit can be a

25   valuable source for calculating reasonable royalty.

1    And, again, that's -- that's good solid analysis.  The

2    reality is it's the same patents.  It's the same

3    technology.  It's the same product -- same products that

4    are out in the market.

5                    Next slide.

6                    This was -- this was a -- this was an

7    entertaining bit from -- from Mr. Mills' report.  In

8    attempting to -- to set aside the LSI license, he

9    actually says that you should set it aside because it

10   includes additional rights to the patents-in-suit.  So

11   it's not -- it's not just that he doesn't like it

12   because it's a settlement agreement.  He doesn't like it

13   because the amount of money that was paid was paid for

14   18 patents -- or I forget exactly what the number is --

15   20 something patents, and, therefore, you should just

16   disregard it completely.

17                   What our expert did, Your Honor, is he

18   assumed that all of the value was attributable to these

19   two patents.  He gave Lake Cherokee every benefit of the

20   doubt and suggested that you could attribute the entire

21   amount of consideration in the LSI agreement to just

22   these two patents.

23                   But even then, Mr. Mills wouldn't do it.  He

24   said, it's -- it's too confusing.  It's too inflated.

25   It's really hard to follow his logic with respect to

1    that particular point.

2              Next slide.

3              The case law tells us that prior sales of

4    the patent suit -- patents-in-suit are absolutely

5    germane to a damages analysis.  The reality is that if I

6    can buy the entire property outright for $18 million,

7    that's got to be a ceiling on royalty damages.  If I can

8    buy the property outright, it's got to be less -- I'm

9    sorry, more than it would cost me to rent is essentially

10   the analysis.

11             Next slide.

12             We also have the ARM analysis that Dr. --

13   that Mr. Mills turns a blind eye toward.  Marvell's SoC

14   products, the accused products, include core

15   microprocessor designs and patents from ARM.  ARM is a

16   well-known technology company out of the UK.  They make

17   microprocessors.  We would have -- we would have tried

18   a -- a case -- it would have been -- it would have been

19   here in June for -- for Apple against Microunity

20   relating to some ARM microprocessors.  Very

21   sophisticated technology, very highly -- highly

22   functioning technology, and yet despite the fact that

23   this is very sophisticated, very core, very essential,

24   ARM's license agreements require a payment of 4 to 14

25   cents a chip, and that's in distinction to the very

1   narrow technology we're talking about here when we're

2   talking about error correction on a read channel

3   product.  And yet Mr. Mills is able to stand before us

4   and ask for 39 cents a chip.  It simply doesn't hold

5   water.

6              Next slide.

7              The fact that he looked at these dozens of

8   agreements, Your Honor, and found that none inform the

9   damages analysis really does scream out for Mr. Mills

10  being corrected under Daubert.  The -- the reality is

11  these entire classes of agreements pad -- past licenses

12  to the patents-in-suit, the sales of the

13  patents-in-suit, the real life valuation of the central

14  technology are the kinds of facts that we want experts

15  to deal with.

16             He may minimize them.  He may say, you know,

17  the -- the Marvell -- I'm sorry, the Lake Cherokee/LSI

18  agreement was -- was a sweetheart deal, and, therefore,

19  I'm going to give it less weight.  He may say that the

20  ARM technology, I can't -- I can't really ascertain how

21  close it is in -- in terms of its comparability.  And,

22  therefore, I'm going to minimize it.  But what he can't

23  do is simply disregard it.  And that's what he's done

24  over and over and over again.

25             So we found -- we are -- we are faced with a

64

1    situation that ResQNet warned us about, that if you

2    reject all these agreements, if you reject all of the --

3    the kinds of evidence that -- that Mr. Mills did, you

4    find yourself at sea and you find yourself without

5    probative, reliable valuation evidence.  And that's --

6    that's what we'll get to in the next two -- two points

7    in the motion.

8                    Next slide.

9                    Just spoke to this without having the slide

10   up.  It really is -- we really are -- are walking the

11   same facts that -- that ResQNet did.

12                   Next slide.

13                   So now let's talk about the smallest salable

14   unit.  Mr. Mills had two bookends.  He had 37 cents a

15   chip or 41 cents a chip, and he picked the middle of

16   that.  And in -- and in order to get there, the first

17   thing he did is he used a -- he used an average revenue

18   number, and he said that it was $4.64 is what -- is what

19   people at Marvell gets -- MSI or MAPL, whomever it is,

20   gets for an 88i SoC.

21                   Next slide.

22                   LaserDynamics and a legion of cases, Uniloc,

23   Microsoft, AT&T, they go back, they tell us we must --

24   we must tie the patented feature to the smallest salable

25   patent practicing unit.  We know that is an absolute.

1   It's been repeated over and over and over again.  And

2   for whatever reason, Mr. Mills has refused to do that.

3              Next slide.

4              We begin with the -- their infringement

5   allegations in this case, Your Honor.  And we've --

6   we've been a little frustrated in the -- in the

7   pre-trial process in that we've been told two different

8   things.  The way these products worked is the -- the SoC

9   is a system on a chip.  It has a read channel function,

10  but it also has a microprocessor function.  It has a

11  hard disk controller function.  It has memory.  It has a

12  fair number of additional electronic components and

13  functions that are associated with it.

14             Marvell sells a read channel component by

15  itself, and that's the -- that's the parts that the

16  Court will see here on the right-hand side of PTX 33,

17  and they're designated as 88C parts.  So any time the

18  Court sees an 88C, that's a read channel part.  Any time

19  you see an 88i, that's an SoC or system on a chip that

20  has the read channel part, plus a microprocessor, plus

21  memory, plus a hard disk control.  Lots of pluses.

22             At the outset of this case, Lake Cherokee

23  accused both of these things.  They accused the read

24  channel component, and they accused the system on a

25  chip.  When we got their infringement report from

1   Dr. Barry, he only addresses the system on a chip.  He

2   was just completely silent about the read channel

3   component.

4          And so we have asked Lake Cherokee time and

5   again whether or not the read channel component remains

6   an issue in this case.  And in the meet and confer

7   processes, they've suggested that it's not at issue.

8   But then we got PX 33, which is one of their trial

9   exhibits that has the 88C components listed as accused

10  products.  And so we're at a little bit of a loss.  But

11  what we know is that -- that through the substantial

12  portion of this case, they looked at the read channel

13  products, the 88C products, and said that infringes all

14  by itself.

15         We're now told that, well, you know, they

16  looked at the Court's claim construction and maybe they

17  want to include some additional features.  We believe

18  it's for validity purposes, but they may have been

19  backing off of that.  But what it does to Mr. Mills is

20  it points out that he didn't even attempt to apportion

21  out the portions of the SoC that are associated with the

22  read channel component versus all the other

23  functionality.

24         Let me take you through that.

25         Next slide.

1          So we start with their 3-1 statements.   So

2     these -- these are their infringement contentions.   And

3     they clearly were accusing the Marvell chips, the model

4     number that begins with 88C.

5               Next slide.

6               When we got Mr. Mills' expert report, he

7     said, well, you know, I understand that the smallest

8     salable patent practicing unit is the SoC.   He

9     understands that, and he cites Dr. Barry's report.

10    Dr. Barry for -- for his -- for his turn, simply looks

11    at it and says, the SoC is the infringing component.

12              If I can have the next slide.

13              Slide 18, he doesn't say anything about

14    whether the 88C products are covered or not.   He simply

15    focuses on the 88i, on the SoC, and just never mentions

16    the 88C.   So we have an excerpt of his -- his expert

17    report here where he talks about the accused products in

18    this litigation are Marvell hard disk drive and SOCs

19    with model numbers 88i.   And then he stops.

20              Somewhere a little further down in his

21    report, he says, you know, the smallest salable unit,

22    that's the SoC, but he never comes back, he never says a

23    word about whether or not that 88C, that read channel

24    component is, in fact, infringing.   And the reason why

25    he says the 88i is the smallest salable component is he

1    said, you can't take it apart.  Once you integrate the

2    chip together, once you put the microprocessor with the

3    read channel with the memory, it's all on a piece of

4    silicon and you can't cut it up, but that's not the

5    analysis.

6              The analysis is can you value those products

7    separately?  The fact that they're packaged together

8    doesn't end the -- the smallest salable unit inquiry.

9    If that were true, well, you know, a carburetor in a

10   truck comes packaged in the truck.  You can't -- you

11   can't just disassemble it.  And the reality is that's --

12   that's -- the same can be said of integrated circuits.

13   When you put -- choose to package them all together on

14   one substrate, that is a manufacturing convenience, but

15   that doesn't mean that it's the smallest salable unit,

16   particularly when they have this read channel component

17   that they have said infringes, that they have said is

18   accused, and then suddenly when it comes time to do the

19   apportionment analysis, they just turn a blind eye to

20   it.  That can't be -- that can't hold up.

21             Next slide, please.

22             I've got a diagram on Slide 19, Your Honor,

23   and I apologize about the size of it.  But here in red

24   in the lower left-hand corner is the read channel

25   component.  The -- the yellow -- and I don't know what

1   color that is -- sort of magenta -- is that -- is that a

2   color -- boxes are CPUs -- CPU cores 1 -- 0 and 1.

3   There are two on the -- on the SoC.  There is a -- a

4   hard disk controller.  There is memory that's provided

5   here.  There are additional components that are provided

6   on the chip.  But you don't have to take my word for it

7   because we find it in -- in Mr. Mills' report.

8               If I can have the next slide.

9               So in his report at Paragraph 42, he kind of

10  forgets about his -- his read channel analysis and --

11  and then talks about the fact that the SoC incorporates

12  the 88C read channel with, among other things, a hard

13  disk controller and embedded memory.  So out of his own

14  mouth at Paragraph 42 of his report, he's telling us

15  that you can apportion the SoC, you can actually

16  identify its subsystems, its -- its individual

17  components.  And he does it here because he's crowing

18  about how revolutionary the 88C was, and then its

19  integrated cousin, the 88i, but he can't deny that these

20  are the facts, and he's right about that, that the 88i

21  includes this read channel component and a couple of

22  other things.  So he should have apportioned this, but

23  he didn't.

24               Next slide.

25               What he does instead is he says, look, I'm

1    going to take the entirety of the 88i, and I'm going to

2    apply my 8 percent royalty rate to it.  And I'm going to

3    ignore the fact that this 88C does everything that we

4    talk about and sells for a dollar less.  And while

5    that's not just a huge delta, necessarily, it is in the

6    damages context.

7                But importantly, what LaserDynamics tells us

8    is that if the expert doesn't apportion, you have to

9    bounce his opinion.  It's that important.  He's got to

10   have done that apportionment, and he's refused to do

11   that in this case.  Instead, he applies his 8 percent to

12   the entirety of the SoC, the entirety of the 88i, even

13   though out of his own mouth the 88C sits there right

14   next to it and does these functions and yet the 88i SoC

15   has these additional componentry.  He should have done

16   the apportionment.

17               Next slide.

18               And then, finally, we -- we -- I want to

19   just highlight a couple of the more novel theories

20   that -- that Mr. Mills has come up with.  He -- his --

21   his other rate is -- comes from a -- a 3 percent

22   internal royalty rate that he finds from MSI.  So how

23   did he do this?  Well, he -- well, actually, there --

24   there are two theories here.  Let me back up.

25               One of them was based on this 3 percent

1    internal royalty rate that was published in a PowerPoint

2    presentation years after the hypothetical negotiation

3    date and was meant to relate to intracompany licenses of

4    the entirety of Marvell's technology, which he then

5    increases from 3 percent to 4 percent without explaining

6    really why.

7              The other -- the other method is he compares

8    the companywide target margin to what he says is the

9    margin for these products.  And he comes up with a

10   delta, and that's how he gets his 41 cents a chip.

11             So I'd like to just take you through that

12   briefly if I can.

13             Next slide.

14             So we start with the fact that the

15   hypothetical negotiation is in September of 2000,

16   September of 2000, and that negotiation would have been

17   between Marvell and Cirrus Logic.  This is going to be a

18   mess to present to the jury.  I'll be the first to admit

19   that.

20             And so within the framework of September

21   2000, what does Mr. Mills do?  He says, well, I'm going

22   to pick -- I found this document.  I found this

23   PowerPoint presentation in 2008 where some executive

24   within Marvell said, hey, we need to have an internal

25   royalty rate as we're swapping intellectual property

1    back and forth between companies, and I think 3 percent

2    is a good number.  But, Your Honor, you'll see in a

3    moment that was never implemented, never -- never got

4    past go, and so the reliability of it is suspect.  And

5    you wonder why Mr. Mills would seize on that as a

6    valuation method.  It has nothing to do with this case.

7    It has nothing to do with these patents.

8              The other one is he compares target margins

9    but, again, from 2007, years and years and years after

10   the hypothetical negotiation date.  And you have to ask

11   yourself, why is he doing that when he had all of the

12   agreements that were closer to the hypothetical

13   negotiation date that he rejected.

14             Next slide.

15             So here's an excerpt, Slide 25, of the -- of

16   the PowerPoint presentation that talked about a default

17   rate of 3 percent that happened to be the same as their

18   worldwide tax uplift rate.  Note, Your Honor, that this

19   doesn't say on a particular patent or a particular

20   technology.  It's for all of their technology, all of

21   their patents, their copyrights, their trade secrets.

22             If I can have the next slide.

23             Well, we -- we have the testimony of

24   Mr. Feller telling us that -- the CFO, that this was

25   never -- this was never implemented.  But more than

1   that, it was not limited to just the patents.  It was

2   all of their IP.

3               Next slide.

4               The fact that it's the entirety of the

5   patents, one of the things that Mr. Mills does in his

6   expert report is he outlines that there are 2,500 plus

7   Marvell patents and another -- I think it's 35 or 4,500

8   pending applications.  Marvell has a massive patent

9   portfolio, but they have a massive amount of trade

10  secrets.  They have a massive number of copyrights.

11              That 3 percent represents all of it, but

12  Mr. Mills makes zero attempt -- he does not attempt to

13  link up this broad intercompany full technology exchange

14  with the patents-in-suit.  So there's absolutely no

15  nexus.  There's no explanation --

16              THE COURT:  Let's see if we can wrap this

17  up, Mr. Ruffin.

18              MR. CORDELL:  Yes, yes.

19              THE COURT:  This is getting lengthy.

20              MR. CORDELL:  That's part of my -- part of

21  my gift, Your Honor.  I apologize.

22              Next slide.

23              So let -- let me just try a couple of

24  things.  The other thing that he does that we find

25  pernicious is that he compares a target royalty -- a

1    target rate of return -- target gross margin of 50

2    percent to what he says is the -- is the margin on these

3    products, and he's wrong, Your Honor.  He uses the wrong

4    products.

5               Next slide.

6               So he comes up with 89 -- 8.9 percent.

7               Next slide.

8               But the actual number for these products was

9    not 58.9 percent.  It was 55.6.  And so if he had used

10   the correct margin, what he would have found was that

11   the -- the bookend rate would have -- instead of being

12   41 cents a unit, it would have been 15 cents a unit.  It

13   would have been a drastically reduced rate.

14              You know, is that a point for

15   cross-examination or is that a point for Daubert?  The

16   complexity of this makes it a point for Daubert because

17   he didn't use -- he wasn't careful in his analysis.  He

18   didn't focus on the right facts, and so he ought -- he

19   ought not to be allowed to testify about it.

20              Next slide.  One more, one more.

21              One last point I'll make, Your Honor.

22              Inexplicably for one of his two damages

23   methods -- remember the 37 cents a chip that he gets

24   from the 3 percent that he increased to 4 percent

25   without explaining why.  He doubles that.  He double it.

1    He says, there are two patents-in-suit.  So for this

2    theory and only for this theory, he doubles his rate.

3    He doesn't explain why.  He can't explain why.  He

4    doesn't double it for his other theory, the 8.9 percent,

5    the one where he's comparing the gross margins that are

6    wrong, but he doubles it without explaining why in the

7    world the hypothetical negotiation between two big

8    parties that have patents would negotiate for them

9    individually.  That's been unprecedented.

10            So with that, Your Honor, I'll pass.

11            THE COURT:  All right.  Let me have a

12   response from the Plaintiff.

13            MR. ADAMS:  Your Honor, good afternoon.

14            THE COURT:  Good afternoon.

15            MR. ADAMS:  The majority, if not the

16   entirety of everything that Mr. Cordell just told the

17   Court regarding its complaints about Mr. Mills' report

18   doesn't go to the Daubert issue.  It goes to them

19   disagreeing with the type of evidence that he relied

20   upon.

21            For example, they argue that he did not rely

22   upon the settlement agreement with LSI.  He didn't rely

23   upon the sales agreement with the Broadcom sale.  They

24   dispute his use of the 58.9 percent versus 55.6 percent.

25   The Courts are clear that when there are questions about

1    the type of evidence or the type of data that the expert

2    relies upon, that's not an issue that goes to whether or

3    not the Court should allow the expert's opinion.  It's

4    an issue for the jury to hear and for them to cross

5    examine and for them to make a determination about.

6    It's a jury issue.  It's not an issue about the

7    admissibility of that testimony.

8            So on that point alone, Your Honor, I do

9    believe that the Court should deny their attempt to

10   Daubert Mr. Mills.  They have not raised any issues that

11   go toward the methodology that he uses because the

12   methodology that he uses, Your Honor, is sound.  He

13   finds the smallest salable practicing unit -- patent

14   practicing unit, he applies the hypothetical negotiation

15   standard, he uses reliable information that he received

16   from Marvell's own documents regarding Marvell's profits

17   that they earn using the patents, and he compares those

18   to reliable information that he gets from Marvell's

19   targeted profit margin, and then he goes through an

20   entire Georgia-Pacific factor analysis.

21           Nothing that -- that defense counsel has

22   raised and has said in this argument challenges any of

23   that.  What they rely -- what they argue, Your Honor,

24   they don't -- they think he didn't base his opinions on

25   the correct information.  And as we stated in our

1   position papers, that is not the subject of a Daubert

2   challenge.  That is for cross-examination.

3          I'm not sure if the Court wants me to go

4   into all of the specific issues, for example, his

5   non-reliance on the settlement agreements.  Now, when

6   they started their Daubert, they claimed that Mr. Mills

7   did not consider those.  Well, in fact, if you read his

8   report, you read our position paper, he thoroughly

9   considered them.  He considered the LSI settlement

10   agreement.  He considered the Broadcom agreement.  And

11   what he did was based on his consideration of those

12   agreements, found that they were not economically

13   comparable, and he set forth all of his reasons for

14   that.  That is not the basis of Daubert.  He considered

15   it.  He used his expert opinion and determined, I can't

16   use them because they're not economically comparable.

17          Now, the reasons why they're not, Your

18   Honor, I'm not going to spend a lot of time on because

19   they're the subject of our Daubert of Mr. Ugone -- or

20   Dr. Ugone, and my co-counsel is going to spend more time

21   discussing that, but for the same reasons we have asked

22   the Court to exclude Mr. -- or Dr. Ugone's reliance on

23   the LSI settlement agreement and the sale agreement

24   between Broadcom and -- and -- and Cirrus is why Dr. --

25   or Mr. Mills did not rely upon it.  It's because they

1   weren't comparable, and it would have been error for him

2   to do so.

3              They talked about these ARM agreements and

4   the DSP, which is the -- the core processing agreements.

5   They're incorrect when they say that Mr. Mills ignored

6   them or didn't rely upon them.  He, in fact, did.  What

7   he did, though, is he disagreed with them.  They claim

8   that those agreements show that there was a ceiling

9   upon -- for which Marvell would not go above.

10             So Dr. Ugone looks at these DSP agreements,

11  and he says, they have rates in them for -- the 17-cent

12  per unit rate.  And he looks at those agreements and --

13  and concludes Marvell would not be willing to pay more

14  than that, so, therefore, your 39 percent rate is

15  unreasonable.

16             THE COURT:  Well, we'll get to Dr. Ugone's

17  motion in a minute.

18             MR. ADAMS:  Sure.

19             Mr. Mills considered the same agreements,

20  and he came up with a different analysis.  In fact, what

21  he concluded was those agreements show that the 17 cents

22  would be a floor, and he explained why.  So there is no

23  evidence in this case that he did not consider those,

24  Your Honor.  He, in fact, did.

25             With respect to the entire market value

1    rule, their initial argument was that that is what

2    should apply.  Well, the entire market value rule only

3    applies, Your Honor, where the expert does not base his

4    royalty on the -- the smallest salable patent practicing

5    unit.

6              What constitutes the smallest salable

7    practicing unit in this case is a technical question

8    that you get from expert testimony.  And what -- what

9    the defense fails to -- to appreciate is this.  The only

10   expert in the case that has done any analysis and that

11   has determined what the smallest salable practice --

12   patent practicing unit is, is Dr. Barry.  And is -- and

13   it is upon that opinion that Mr. Mills relies.  He

14   doesn't come up with it on his own because he can't.

15   He's an economist.  He is not a technical expert.  So he

16   relies upon the technical expertise of another expert,

17   and he is explicit in his report that he is using the

18   smallest salable patent practicing unit, which is the

19   SoC.

20             Now, to the extent that there's any question

21   as to whether or not the SoC is, our papers set forth

22   that analysis extensively.  And, in fact, contrary to

23   what they're saying, there is no evidence to suggest

24   that there's any other part of the accused product in

25   this case, which is the SoC, that can be separated from

1    the SoC and sold separately and still be a patent

2    practicing unit.  And that is what Dr. Barry said.

3    There is none.  Not the read channel core, it can't be.

4    So there's no basis for finding that that core itself is

5    some salable small -- a salable patent practicing unit.

6    There just isn't any evidence of that.

7              THE COURT:  I don't mean to cut you off,

8    counsel, but quite honestly, I think the Court knows

9    what its ruling is going to be in this matter, and we do

10   need to move on.

11             MR. ADAMS:  Your Honor, to save time, I -- I

12   have no further argument unless the Court asks, and I --

13   I get the signal that you don't have any, so I'm going

14   to rest at this point.

15             THE COURT:  Well, while Mr. Mills' testimony

16   and his presentation is certainly going to be subject to

17   dispute during the trial, this witness' qualifications

18   and methodology are not so flawed in the Court's opinion

19   as to require the Court to bar him from testifying in

20   its gatekeeping role under Daubert, and, therefore, I'm

21   going to deny the motion.

22             And we'll next move to Lake Cherokee's

23   motion with regard to Dr. Keith Ugone.

24             And I'll hear from Lake Cherokee on their

25   motion to exclude certain opinions and testimony of

1    Keith Ugone, Document 399.

2              You may proceed, Mr. Dovel.

3              MR. DOVEL:  Thank you, Your Honor.

4              Your Honor, we're challenging two aspects of

5    Dr. Ugone's opinion, and these are aspects that are

6    controlled by Federal Circuit authority, Federal Circuit

7    authority that says, before you may use a prior

8    transaction to value the hypothetical negotiation, it

9    has to be economically comparable and you must then make

10   adjustments where it is not, so then you can -- you can

11   draw inferences from it.

12             For example, the Wordtech case, there were

13   lump sum agreements, agreements that call for payment of

14   a lump sum.  And a party wanted to use those.  The

15   Federal Circuit said, no, as a matter of law, it per se,

16   must be excluded because a lump sum tells us nothing.

17   How many units was that for?  Was that to license a

18   hundred units, or is that to license a million units?

19   Without that information, we have no idea.  We can't

20   present that to the jury because it would be unduly

21   prejudicial.  They might think it has some relevance.

22             So let's take the Cirrus-Broadcom agreement.

23   18-million-dollar lump sum.  Dr. Ugone says, okay, $18

24   million is the -- is the number.  I infer from that 18

25   million would be a reasonable royalty.

1          What does the Cirrus/Broadcom agreement got

2     to do with the hypothetical negotiation between Cirrus

3     and Marvell?  Absolutely nothing.  The agreement --

4     the -- the negotiation that we're valuing, the

5     Cirrus/Marvell negotiation, would have been in 2001, and

6     it would have focused on Marvell's use of the accused

**REDACTED BY ORDER OF THE COURT**

7     technology in ███████████████ over a 13-year period.

8     That's all the information that they would have known at

9     that time under the hypothetical negotiation, and they

10    would have known it was infringed and valid.

11         Broadcom and Cirrus had none of that

12    information reflected on none of it, took none of it

13    into consideration.  Instead, at that point, Cirrus had

14    a group of patents that it wasn't using, was out of the

15    business, wanted to get as much as it could for them.

16    Broadcom wanted to pay the cheapest price possible.  It

17    purchased a large group of patents so that it could find

18    some things to assert against another company, Agere, in

19    a patent war that was ongoing.

20         There was no evaluation by Cirrus or

21    Broadcom of the value of an infringement claim against

22    Marvell.  And there was -- there was no evidence that

23    that dollar amount reflected that.  For example, if they

24    had done that analysis, they might have concluded, well,

25    we have a 10 percent chance of winning it, and we think

1  the damages are going to be about a hundred million

2  dollars, and, therefore, we'll assign about $10 million

3  to that value.  That sort of stuff could have happened.

4  If we had that information, we could then use that

5  Cirrus/Broadcom negotiation to draw some inferences from

6  it.  But we have none of it, and that's because the

7  Cirrus/Broadcom transaction had absolutely nothing to do

8  with a claim against Marvell.

9           What is Marvell's answer?  They say, well,

10  if you buy a patent, whatever you pay for that patent,

11  it must be greater than the value to license it.  It

12  must be.  Their own expert does not agree with that,

13  Your Honor.  And the reason is it's absolutely false.

14  If I buy a piece of land for $10,000.00, two acres of

15  land, and then sometime later the oil or gas company

16  comes along and they want to buy my -- my mineral

17  rights -- I've got the mineral rights -- and they want

18  to drill some oil.  They want to -- they want to pay me

19  royalties.

20           THE COURT:  We call that a lease.

21           MR. DOVEL:  A lease.  Am I limited to

22  getting 10,000 bucks from them?  They pull out $10

23  millions in oil.  The amount I paid for the land before

24  the oil was discovered is completely irrelevant to this.

25  So if we have a transaction to purchase property, a

1    patent, that doesn't mean that that is then a cap on

2    what the license will be for that.  In fact, we know

3    just the opposite, that the parties to that transaction

4    would expect that the licenses will be something more

5    than that.  We don't know how much more.  It depends on

6    what facts they have in front of them.

7              And in this case, the parties to that

8    transaction made no analysis to the Marvell hypothetical

9    negotiation, therefore, it has nothing to do with it.

10   It's a lump sum amount, and under the Federal Circuit's

11   controlling authority, Wordtech, unless we have the

12   ability to make that comparison, it must be excluded.

13   There's no discretion.

14             What about the LSI agreement?  Same thing.

15   The only difference there is that Dr. Ugone says, well,

16   I've got to do something to make these look comparable.

17   But in his own words -- I'll quote from his report.  The

18   number of relevant LSI units is not available.  In other

19   words, he recognizes that to draw inferences from it,

20   we've got to compare the number of LSI units that would

21   have been licensed to the number of Marvell units.  Was

22   LN -- LSI, did they pay their license amount for a

23   hundred units for a hundred million units?  It makes all

24   the difference.  We need to know.

25             But he doesn't have that information.  So,

1   instead, he says you know what, let me just look at some

2   market share data, but it's not market share data for

3   infringing chips.  It's market share data for, quote,

4   storage products, close quote.  Storage products

5   includes both hard drives and non-hard drives.  And on

6   the hard drive side, it includes chips that have read

7   channels in it and things that don't, such as preempts.

8   And for read channels, it includes infringing read

9   channels and those that do not.  He had absolutely no

10   information about the number of infringing units that

11   were made by LSI.

12          In addition, Your Honor, with respect to the

13   infringing units, he had no information about how many

14   of those were sold in the U.S.  He took worldwide

15   numbers for LSI without the ability to compare it under

16   Wordtech, and it must be excluded.

17          In addition, Your Honor, we have a motion in

18   limine to exclude it, and we make this round as a

19   settlement agreement.  I can address that now if you'd

20   like or reserve that.

21          THE COURT:  No, let's reserve it until we

22   get to the motions in limine.

23          MR. DOVEL:  Yes.

24          THE COURT:  Let me hear a response.

25          MR. MANN:  Thank you, Your Honor.  Mark Mann

1    for MSI.

2              And -- and I won't address the motion in

3    limine at this point, even though it's highly related.

4    But I want to go back to what the bottom line is in this

5    case because I know the Court's interested in the bottom

6    line.

7              What they're saying is that they want to

8    disregard that we're not entitled to look at past

9    history, that they want to hide prior transactions, that

10   they want to claim that 408 bars the jury's knowledge of

11   prior ARM's length transactions of one sale and two

12   licenses.  And case law doesn't support that.  That's

13   ResQNet, LaserDynamics, also, Data Treasury.

14             And common sense doesn't support it.  If you

15   use the analogy that they're using and I -- the sale of

16   land, I think it's more akin to the sale of a

17   subdivision.  If somebody sells a subdivision and pays a

18   certain price for it and then somebody wants to sell a

19   lot off of it, obviously, the value of the subdivision

20   is more than the one lot even if that lot is the corner

21   lot overlooking the lake and the best -- the best lot in

22   the subdivision.

23             This Court's prior practice in the Hill

24   versus ABT case, although admittedly, it's a discovery

25   case, it's an issue about discovery of prior

1    negotiations, the Court, I think, I can -- I'm going to

2    try to read into that, and I think it should be, that

3    the Court would not have allowed discovery of prior

4    negotiations of the prior settlements of prior sales

5    without it being irrelevant to a case and relevant to

6    that case.  So I think we can infer that the fact that

7    we have prior sales of not only a license but prior --

8    but we had licenses with prior sales would be relevant

9    to this matter.

10          Now, what I want to do is -- is we have a

11   PowerPoint here, Your Honor.  Of course, you know -- or

12   at least $848 million was the claim.  That will change

13   now in the hypothetical negotiation.  But if we go to

14   the next slide, we have, as Mr. Cordell talked about in

15   his previous representation to you, that the

16   Broadcom/Cirrus sale, which by the way, occurred after

17   there was an attempted sale by Cirrus to Marvell.  And

18   this is in our briefing, but Marvell was approached by

19   Cirrus to buy lock, stock, and barrel everything, the

20   patents included in this suit, 34 other patents, the

21   bricks, the mortar, the people, the manufacturing

                  REDACTED BY ORDER OF THE COURT

22   facilities for ███████████████.  It didn't work.

23   Marvell didn't want those.

24          So there was the Broadcom/Cirrus sale.  And

25   what they've tried to say -- Mr. Dovel is trying to say

1   is that somehow or another there was no knowledge of

2   what the value of those would be by Marvell or others.

3   The fact is there was a license given in 2000 for

4   this -- for the patents-in-suit.  There was a sale in

5   2004 of these patents-in-suit, plus all these other

6   patents.  And it was to a competitor of Marvell's for

7   the $18 million.

8           Then we had the license -- the LSI license

9   that was the 19 patents which included foreign --

10  foreign -- foreign sales, which included the foreign

11  patent-related matters, which included the two in the

12  suit between Lake Cherokee and LSI and included

13  Marvell's principal competitor in the read channel

14  space.  And that was for an amount of money which is in

15  our briefing that I won't disclose.

16          Now, what I would say, Your Honor, is that

17  according -- and -- and I know that you don't want to go

18  into the -- the motion in limine, but there was also

19  another sale to Hitachi for the ■ ▬▬▬▬▬▬ -- well,

REDACTED BY ORDER OF THE COURT

20  for an undisclosed amount of money.

21          So those are all related to this matter

22  because they, in fact, show a hypothetical negotiation

23  of the value of patents plus more.  And Dr. Ugone, what

24  he did was in his analysis is he took the position that

25  a hundred percent of the value of these sales and

```
 1   licenses would be related to the two patents in this
 2   suit.  He disregarded other patents, the bricks and
 3   mortar, the people, everything else, and gave them zero
 4   value.  It's the most conservative way that you can
 5   evaluate this case to put before a jury.
 6            Now, what's important in this case, I think,
 7   and I think it's going to be true in front of the jury,
 8   is that Lake Cherokee has taken the position that their
 9   two patents-in-suit are absolutely essential to this SoC
10   chip and the read channel matters, that you have to have
11   them in order for the product to work -- in order for it
12   to be useful, in order for it to be salable.
13            And what they're trying to say is Dr. Ugone
14   didn't go through the proper process of -- of trying to
15   evaluate that.  There's nothing to evaluate, Your Honor.
16   He gives a hundred percent of the value of these two
17   patents to the sales.  He gives them -- he takes the
18   position, okay, let's say they're infringed.  He takes
19   the position that let's look at in the past what sales
20   have been and what licenses have been, and which by the
21   way, Wordtech was not a -- it was a license case.  It
22   was not a sale case.
23            And we know that in ResQNet and in
24   LaserDynamics that the Court has said -- the Federal
25   Circuit has said that prior sales in litigation
```

1  circumstance or even a sale versus a sale are something

2  that are relevant to the -- the evaluation of whether

3  there's a reasonable royalty paid in a matter.

4          So let's move through -- I probably talked

5  about several of these matters, Your Honor, and I know

6  Mr. Cordell has talked to them.

7          THE COURT:  Let me -- let me see if I can

8  save you some time, Mr. Mann.

9          MR. MANN:  Yes, sir.

10          THE COURT:  I am persuaded that these two

11  matters have material probative value, especially in

12  light of the limited other sources.  I don't find that

13  the movants have established any more of a fatal flaw in

14  your expert than you established in theirs, and I'm

15  going to deny their motion --

16          MR. MANN:  Thank you, Your Honor.

17          THE COURT:  -- under Daubert.

18          And that's with regard to Document No. 339,

19  Lake Cherokee's motion regarding Keith Ugone.

20          We'll next take up Lake Cherokee's motion

21  with regard to Dr. Richard Blahut.  I'm not sure of the

22  exact pronunciation.

23          Mr. Dovel.

24          MR. DOVEL:  Your Honor -- Your Honor, he

25  told me it was Blahut.

1             THE COURT:  Blahut.  All right.  Dr. Richard

2     Blahut.  I'll hear from you on this motion.  And let's

3     try to pick up the pace, counsel.  We still have a lot

4     of ground to cover.

5             MR. DOVEL:  Yes, Your Honor.  I'm going to

6     address -- if I could have the -- I'm just going to deal

7     with one issue with regard to this, Your Honor.  And

8     that is their argument that all Dr. Blahut is doing is

9     just -- just extrapolating from what was -- what was in

10    their interrogatory responses.

11            And I'm going to do it this way, Your Honor.

12    This is Claim 1 of the '162 patent.  And there's an

13    element, Element D that's for a channel quality circuit

14    for calibrating the synchronous read channel.  Your

15    Honor may recall that was part of -- there was a claim

16    construction on that issue.

17            Well, we asked them what -- if you think you

18    don't infringe, tell us why.  And they went through it

19    element-by-element and told us why.  For this element,

20    they started out this way.  Finally, this chip does not

21    have a channel quality circuit for calibrating the

22    synchronous read channel.

23            Now, if they'd stopped there, we would have

24    moved to compel and say, well, why not.  Give us the

25    facts, the reasoning.  Why is that?  You're just telling

```
 1   us those words aren't there.  What is it?  Is it not
 2   calibrating?  Is it not a channel quality circuit?  What
 3   is it?  But they didn't stop there, Your Honor.  They
 4   give us the reason.  They gave us their non-infringement
 5   theory.  Here it is on this screen now.  It was that
 6   this chip does not adjust variable detector levels to
 7   generate the lowest possible error rate during normal
 8   operation.  And that was something that they sought to
 9   require in the Court's construction.  They wanted that
10   imported into the channel quality circuit, and it didn't
11   come in as part of the channel quality circuit.
12           But what does Dr. Blahut say?  Does he then
13   present that theory that there's no channel quality
14   circuit because it doesn't adjust variable detector
15   levels?  No.  Here's his report, Your Honor.  He says
16   that the recited channel quality circuit must be within
17   the read channel, and here we've got a microcontroller
18   that's separate and apart from the read channel.  In
19   other words, Dr. Blahut's opinion that he's presenting
20   about the channel quality circuit element is an entirely
21   new theory, one that had never been disclosed during
22   discovery, one that we had no chance to take any
23   discovery from their engineers on, to -- to identify
24   documents on.  As a result, Your Honor, we were
25   prejudiced.  It was certainly too late.  They offered no
```

1    justification for it.  They simply say, well, what he's

2    really doing is just elaborating on what was in the

3    interrogatory response.  We can look at the words here

4    and see clearly he's not.

5              Just so there's no ambiguity, I asked

6    Dr. Blahut in his deposition, the theory you're

7    presenting there, is that this one in the interrogatory

8    response?  He says, no, no, I'm not presenting that one

9    in the interrogatory response.  So there's absolutely no

10   debate about that.

11             What about for Claim 1?  I'll just do this

12   very quickly, Your Honor.  Same sort of thing.  There's

13   a long phrase here about trellis-type sequence detector

14   for detecting the binary data from the sample values.

15   There's lots of different ways that somebody potentially

16   might not be infringing, all different kinds of

17   possibilities.

18             What do they do in their rog response?  They

19   identify three.  And I've got them on the board, they're

20   in our papers, but they have to do with having a

21   particular type of transition diagram, programmable

22   detector levels, and ACS module.  Dr. Blahut's theory

23   has nothing to do with that.  It's completely different,

24   focuses on even different words in the claim.

25             His theory is that the sequence detectors do

1    not detect the binary data from the raw sample values.

2    Again, he agreed in deposition, this theory here is not

3    the one that's presented in his interrogatory responses.

4    He's got a new theory.  It was not disclosed to us

5    before.  During discovery, we had no chance to take

6    discovery on it.  They offered no justification, and

7    we're certainly prejudiced.

8              With that, Your Honor, I'll -- I'll say

9    that, again, we show in our papers the same sort of

10   thing for their non-infringing alternatives, they're

11   brand new.  And with that, Your Honor, I'll rest, unless

12   the Court has any questions.

13             THE COURT:  No.  I'll hear from the

14   Defendant on this.

15             MR. COLAIANNI:  Your Honor, Joseph Colaianni

16   on behalf of Defendant Marvell Semiconductor.

17             If I could -- let me just say I disagree

18   with Mr. Dovel's premise that there needs to be some

19   sort of a mirror image between the experts' opinions and

20   what's in contention on rog responses, but before I get

21   to that, it might be helpful if I can just address the

22   points he just raised in his presentation.  And I think

23   it would be helpful -- I have a slide that actually

24   shows the contentions and Dr. Blahut's opinions

25   side-by-side, if that would help the Court.

1                This is -- turn to Slide 11, please.

2                Dr. Blahut offered opinions relating to

3        non-infringement of the '738 patent.  This is from Claim

4        1, and the contention that Marvell raised in the

5        interrogatory responses in the left column of the chart,

6        and we indicated here that the Marvell chip -- at the

7        time, there was only one chip that infringement

8        contentions hadn't been provided for, and it's the

9        reason we're referencing this 88i8826 chip.  We said it

10       does not include the 12 type sequence detector for

11       detecting binary data from the sample values.

12               Dr. Blahut's opinion that he expressed in

13       his reports is on the right side of the -- of the slide,

14       and he has -- he has a similar opinion.  He does expand

15       this opinion, as experts need to do in their report per

16       Rule 26.  He explains why -- why the sequence detector

17       is not detecting binary data from the sample values

18       because the sample values were construed by the Court as

19       something that are not filtered.  And that's the basis

20       that he goes and explains in his report.  And he was

21       deposed on this opinion, and I would also add Dr. Barry,

22       Lake Cherokee's expert, submitted a supplemental expert

23       report that specifically addressed these so-called new

24       opinions.  So I take issue with the statement that they

25       did not have any opportunity to take discovery on this.

1                 I would also note there was plenty of

2    discovery taken from Marvell's engineers during fact

3    discovery relating to the filter, the purpose of the

4    filter in Marvell's products, the output of the filter,

5    where the output of the filter goes, where the sample

6    are provided, the entire operation of the chip.  So

7    there was plenty of discovery taken on these very

8    issues.

9                 If I could have the next slide, please.

10                This slide is similar to the previous slide,

11   but it relates to the '162 patent -- non-infringement

12   contentions.  And, again, we see Marvell's contention

13   interrogatory responses on the left side, and we put out

14   here that this Marvell chip does not have a channel

15   quality circuit for calibrating the synchronous read

16   channel.

17                And Dr. Blahut's opinion is on the right

18   side.  It's also similar to this.  He's saying that,

19   yes, there's nothing in the Marvell chip on the read

20   channel for calibrating the -- the -- the read channel.

21                As Mr. Dovel mentioned, this was subject to

22   claim construction by the Court.  The term "channel

23   quality circuit" was construed to require both measuring

24   the read channel and calibrating the read channel based

25   on the -- and Dr. Barry, Lake Cherokee's expert, mapped

1  that portion of the channel quality circuit calibration

2  onto this microcontroller which is not part of the read

3  channel.  And that was explained by Dr. -- Dr. Blahut in

4  his report.  And, again, it was subject to his

5  deposition.  He was questioned on this.  And Dr. Barry

6  had a chance to rebut this, and he did.  He put it in a

7  supplemental report which addressed this very

8  contention.

9          So I wanted to just to raise that -- that --

10  there is a consistency between Dr. Blahut's opinions and

11  Marvell's contentions.  It's certainly true that

12  Dr. Blahut expands on the contentions.  He offers --

13  he -- he elaborates on the basis for his opinions, as

14  he -- he needs to do, as all needs to do.

15          I point out that Dr. Barry, Lake Cherokee's

16  expert, submitted two expert reports that totaled almost

17  four or 500 pages in length, and they are much, much

18  more detailed than the contentions that we received from

19  Lake Cherokee.  We didn't seek to strike those or -- or

20  amend them or -- in any way because it's expected that

21  he would need to elaborate on the opinions, per Rule 26,

22  and provide the basis for those opinions, just as

23  Dr. Blahut did here.

24          I think it bears noting, Your Honor, that

25  the -- essentially what Lake Cherokee's thinking --

1    seeking is very -- very severe.  They're seeking to

2    strike, per their motion, all of MSI's non-infringement

3    theories for the '738 patent, all of MSI's

4    non-infringing alternatives, and key non-infringement

5    theories for the '162 patent.  So this is -- this is

6    basically seeking to gut MSI's case on -- on the

7    liability issue during the trial.  The basis are these

8    so-called new opinions by Mr. Blahut and is alleged

9    prejudice based on -- to take discovery on these

10   opinions.

11          As I -- as I noted at the outset, I think

12   this is based on a faulty premise because I think this

13   Court and others have realized that there were

14   differences.  Different standards apply to expert

15   reports and expert opinions and contentions to

16   interrogatory responses.

17          Again, I -- I can't amplify this enough,

18   that there's been a prejudice here to Lake Cherokee.

19   This is a point that Lake Cherokee doesn't -- doesn't

20   address in its briefing.  They were reasonably placed on

21   notice of these defenses.  They took extensive fact

22   discovery from several witnesses, including Greg Burd,

23   Alex Nazari, Zining Wu.  These were -- these were

24   gentlemen who designed these chips.  They asked them all

25   about the operation of chips.  They asked him about the

1    -- the channel statistics.  They asked him about the

2    microcontroller.  They asked him how the read channel

3    works.  They asked how the samples -- digital sample to

4    process themselves through the chips, if they were

5    filtered, where the samples go.  It was extensive

6    discovery, and much of this has been designated in the

7    deposition testimony that Your Honor will see.

8              Dr. Barry then submitted a gratuitous

9    supplemental report, and the entire purpose of his

10   supplemental report was to address these so-called new

11   opinions.  This was in March after Dr. Blahut's report

12   came in.  So he was full -- he had a full opportunity to

13   address this.  We didn't seek to strike that opinion.

14   We didn't anything that's in that report.  That report

15   came in.  Dr. -- Lake Cherokee then deposed Dr. Blahut

16   on all of his opinions for the full amount of time.

17             This is just a page from Dr. Blahut's

18   report, supplemental report.  You'll see here this is to

19   respond to certain new assertions made by Dr. Blahut in

20   his opinion -- his report dated March 15th, 2013.  I

21   don't agree with the -- with the allegation that they're

22   new opinions, but this is the purpose of Dr. Barry's

23   report.

24             He also noted at the bottom of the slide

25   that he is proposing -- offering opinions in response to

1    non-infringement alternatives that were presented in

2    Dr. Blahut's March 15th expert report.

3            I have a few slides here.  I won't belabor

4    this, Your Honor.  This is just recognition here by the

5    Court that expert reports and contention interrogatories

6    are expected to have different levels of detail in terms

7    of setting forth contentions on the merits.  Contention

8    interrogatories are not required to include all the

9    evidence that require to set forth general theories and

10   bases therefore.  All expert reports are held to a

11   different standard under Rule 26.

12           THE COURT:  Well, that may be true, but the

13   purpose of the contention interrogatories is to put the

14   other party on notice of what you're really claiming,

15   give them an opportunity to fully and accurately develop

16   it through the discovery process, which is closed by the

17   time that expert's report hits the table.  And it seems

18   to me that there's a good argument here that what

19   Marvell has done is given a conclusion without providing

20   any reasoning and without giving the full picture to

21   opposing counsel to allow for that full and complete

22   discovery.  And I'll be honest, counsel, I have some --

23   I have some concerns about how that developed in this

24   situation.

25           For example, under the '783 patent, you

1    know, it's clear that the earlier disclosure addressed

2    the sequence detectors not detecting the binary data

3    from the raw sample values, but those initial

4    disclosures say nothing about instead of that, the

5    conduct sequence detectors are put through the output,

6    F-I-R, or FIR filters.  That's left out completely.  And

7    it only shows up in the expert's report after the close

8    of discovery.

9          I think there's -- I think that's

10   problematic.  I think that fails to give the other side

11   a reasonable opportunity to use the discovery process to

12   develop their replies and defenses to what you're

13   asserting.  I think the same type of thing is true in

14   the '162 non-infringement situation regarding these

15   channel quality circuits.  And there are -- there are

16   things that, yes, the standard between the contention

17   interrogatories and expert's report are different, but

18   that doesn't mean that the expert's report should show

19   up with brand new things that have never been seen or

20   disclosed before after the close of discovery and the

21   other side is really helpless to do much about it.

22          And quite honestly, unless you can convince

23   me otherwise, I think -- I think the Plaintiff's got a

24   pretty good argument on these points.

25          MR. COLAIANNI:  If I could address this,

```
 1   Your Honor.  It was particularly challenging in this
 2   case to -- to provide rebuttal contentions during
 3   discovery because of the way that Lake Cherokee
 4   presented its infringement contentions.  This is laid
 5   out in our brief.  And this just began with a set of
 6   contentions -- and 3 -- 3-1 infringement contentions
 7   that were based on patents instead of products.  We had
 8   several meet and confers.  We ended up getting revised
 9   supplemental contentions for one chip that had many
10   alternative theories.
11           THE COURT:  You know, I -- I understand that
12   it always feels good to talk about where the other side
13   fell down, but I'm talking about where your side fell
14   down.  And I'm asking you to give me an explanation or a
15   justification for it.  And a justification for it is not
16   the other side did something wrong, too.  That's --
17   that's not really addressing my concern.
18           I want to talk about your conduct, not
19   theirs.  There will be plenty of time to talk about
20   theirs, but pointing the finger at a mistake they made
21   doesn't excuse a mistake you made.  And that sounds like
22   where you're going here.  And if that's where you're
23   going, I can save you some time because that's not going
24   to persuade the Court.
25           MR. COLAIANNI:  Sure.  I -- I wasn't
```

1    intending to point the finger or anything like that.

2    What I was just suggesting to say is that Marvell did

3    its best to prevent -- present contentions based on what

4    it understood Lake Cherokee's infringement allegations

5    to be.

6              We put in these responses.  Dr. Blahut, when

7    he was retained, looked to Mr. Barry's report which had

8    come in after Lake Cherokee had settled on an -- on an

9    infringement theory, and he -- he presented opinions

10   that were responsive to Dr. Barry's allegations.  We

11   believe they are consistent with what was presented in

12   the interrogatory responses, but Marvell did its best.

13   There was no intent to hide anything.  We -- we provided

14   all the deposition testimony that they asked for.

15             THE COURT:  Well, you know, when you say you

16   did your best, your best didn't include coming to the

17   Court and asking the Court to get involved in the

18   process and require some clarification so that you could

19   do the job you needed to do.  You never came and asked

20   for that.

21             And at the end of the day, what you put out

22   is a contention interrogatory response, and what's in

23   your expert's report are substantially different with

24   new things that just weren't there before.  And that --

25   that's the kind of prejudicial effect, when it comes

1    about after the close of discovery, that is

2    fundamentally unfair to -- to the opposing side.

3              I would have the same concerns if the roles

4    were reversed, and they had done to you what it appears

5    to me you have done to them.

6              MR. COLAIANNI:  Your Honor, they had an

7    opportunity to address this through their expert.

8    Mr. Barry did put in the supplemental report to address

9    each and every one of these opinions that Dr. Blahut set

10   forth in his opening report after his report came in.

11   He -- he submitted a supplemental report, not in

12   response -- not on invalidity issues, but on these

13   non-infringement issues and non-infringing alternatives

14   to address each and every one of them.

15             And Dr. Blahut was deposed.  I don't believe

16   there was any -- any real prejudice to Lake Cherokee

17   based on those -- those factors.  They have all the

18   information that we have now as we head to trial.

19             I would also point out that there was a

20   claim construction that came in during the case, as

21   well, obviously, and that did affect the contentions

22   that were put in during discovery, as well.

23             THE COURT:  All right.  Do you have anything

24   else for me?

25             MR. COLAIANNI:  Not unless the Court has any

1    questions.

2              THE COURT:  Not any additional questions.

3              Mr. Dovel, I'd like to hear from you again.

4    Specifically, I'd like you to address for me the

5    statement from Marvell that you're not prejudiced in any

6    way by this.

7              MR. DOVEL:  Yes, Your Honor.

8              We were prejudiced because we could take no

9    percipient witness discovery on these theories.  I'll

10   give you an example, Your Honor.  This theory that

11   Dr. Blahut gives us for the first time that we've got to

12   have the microprocessor inside the read channel core,

13   all right?  We took no discovery from -- or essentially

14   none.  A non-technical witness at the end, their CFO, we

15   didn't ask what's this read channel core?  What's that

16   mean?  What's the -- what's the scope of it?  It wasn't

17   a focus of any of the discovery, the meaning of core,

18   the significance of core.  We didn't -- we took almost

19   no discovery on the concept of what's an integrated

20   circuit because we assumed that was undisputed.  Nobody

21   had raised that as an issue at all.  We got a deposition

22   clip from one of their experts, or from one of their

23   witnesses that helps us, but that's just one.  We didn't

24   get to elaborate on it.  We didn't get to take any

25   discovery on that.

1            If we go to the sequence detector, again,

2    this theory is not something that we were focused on at

3    all.  We focused on the theories that they are presented

4    in their -- that they did present.  They presented three

5    different non-infringement theories for the sequence

6    detector for the '738.  We explored those in discovery.

7    We did not explore this one.

8            Our expert does present an opinion.  We're

9    not completely naked, Your Honor.  We're not going to go

10   into trial and just give up.  We did what we could, but

11   we were not able to take discovery, and there's simply

12   no excuse.  You didn't hear an excuse, Your Honor.  They

13   could have given us that information earlier.  They just

14   didn't do it.

15           THE COURT:  All right.  Anything further?

16           MR. DOVEL:  Nothing, Your Honor.

17           THE COURT:  All right.  With regard to the

18   '783 non-infringement portion of the expert's report,

19   I'm going to allow you to go into the portion regarding

20   the sequence detectors not detecting the binary data

21   from the raw sample values.  I think that was clearly

22   disclosed.

23           But the provision where he says they instead

24   conduct sequence detection on the output of the FIR

25   filters was not disclosed and appeared after the close

1    of discovery in his report.  And I believe that is

2    improper, and I'm going to preclude the Defendant

3    from -- or the Defendant's expert, Dr. Blahut, from

4    going into that portion of his report regarding the '783

5    patent.

6              On the '162 patent, I'm going to grant the

7    movant's application to strike those portions laid out

8    in his motion as -- I'm also going to grant the movant's

9    request for relief regarding to non-infringing

10   alternatives.  I simply believe that Marvell, as they

11   did elsewhere, failed to meet their obligation to give

12   full disclosure.  And if there was confusion or

13   misunderstanding or lack of information that allowed

14   them to discharge that duty, the Court was available for

15   them to come to and seek intervention, clarification.

16   They never did that.  And at the end of the day,

17   Plaintiffs got this in the Defendant's expert report

18   substantially for the first time, and I think that's

19   prejudicial and unfair.  And, therefore, I'm going to

20   grant the -- the relief that's specified herein.

21             MR. DOVEL:  Your Honor, just one question.

22   With respect to non-infringing alternatives, is that for

23   the '162 only or for '738 and the '162?

24             THE COURT:  I think -- I think your -- I

25   think your requested relief in the motion is applicable

1    in both cases.

2              MR. DOVEL:  Yes, Your Honor.

3              THE COURT:  All right.  It appears that that

4    takes care of the pending disputed motions, both summary

5    judgment or Daubert basis.  And that it appears

6    appropriate that we start with the parties' motions in

7    limine.

8              Is anybody aware of any other Daubert or

9    summary judgment-type dispositive motion that we've not

10   taken up?  Have I missed anything, counsel?

11             MR. DOVEL:  No, Your Honor.

12             THE COURT:  All right.  Then we're going to

13   proceed to take up Plaintiff's motions in limine.

14             And I'll say this, counsel.  Several of the

15   motions in limine from both sides of the case simply

16   appear to me to be a second bite at the apple that's

17   already been dealt with on either summary judgment or

18   Daubert.  And I don't think the rules provide you get a

19   second bite at the apple in a motion in limine.  These

20   are going to rise and fall with my rulings on this

21   Daubert and -- and summary judgment motions.

22             Also, there's several of these motions in

23   limine that are general and lack any real specificity,

24   and they fall in the category of what the Court

25   sometimes calls a "follow the rules" motion in limine.

1    If your motion in limine is so general that it in

2    essence asks me to order the side -- the other side to

3    follow the rules, I don't consider it a legitimate

4    motion in limine.

5              Without some specificity and some detailed

6    information, it really is of no help to the Court when

7    your motion simply asks me to enforce the rules that are

8    already there.  And I don't believe that -- that those

9    kinds of motions in limine really warrant or deserve to

10   be granted because quite honestly, the rules are the

11   rules, and they're there to be followed anyway.

12             So some of these look to me like they fall

13   into that category, but we'll take them up one at a

14   time.  And we'll start with -- we'll start with the

15   Plaintiff's motion in limine.  There may be one or two

16   agreements here, counsel.  I gather there are very few

17   agreements between the parties on these motions in

18   limine.  Are there any new agreements the Court might

19   not be aware of or are all of these pretty much

20   contested?

21             MR. DOVEL:  All but the one the Court was

22   notified about.

23             THE COURT:  Nothing in addition to that?

24             MR. MANN:  I think that's all, but we -- a

25   number of these, you're right, we can move through

1  pretty quick.

2              THE COURT:  Okay.  Let's start with the

3  Plaintiff's motion in limine.  We'll start with No. 1.

4              MR. DOVEL:  Your Honor, I believe No. 1

5  and --

6              THE COURT:  Let's go to the podium, counsel.

7              MR. DOVEL:  Your Honor, I believe No. 1 and

8  No. 2 were resolved with the motions -- motion for

9  summary judgment and the Daubert motion.  No. 1 is about

10  the marking issue, and that's been resolved.

11             THE COURT:  That appears correct to the

12  Court.

13             Defendant feel differently?

14             MR. CORDELL:  No, Your Honor.

15             THE COURT:  Okay.  I think those are

16  basically mooted by the rulings on the motions for

17  summary judgment.  That would be Plaintiff's 1 and

18  Plaintiff's 2.

19             MR. DOVEL:  2 relates to the -- the Daubert

20  on Mr. -- Dr. Blahut that was just discussed.

21             THE COURT:  Yes.  And, quite honestly, this

22  is one of those that looks like it's your second bite at

23  the apple, but anyway I think it's already been dealt

24  with.

25             All right.  Let's look at Plaintiff's No. 3

1  with regard to Alex Nazari.

2          MR. ADAMS:  Your Honor, this -- this issue,

3  it sort of mirrors some of the other issues that have

4  arisen in this case regarding disclosure of information.

5  Alex Nazari is an employee of Marvell.  He was deposed

6  in this case on two occasions.  One was in his

7  individual capacity, the other he was offered as a

8  30(b)(6) witness on two topics, both related to some

9  technical issues, one specifically on the technical

10  aspect and one on the benefits of the invention.

11          THE COURT:  This go to matters he was not

12  noticed on for his 30(b)(6)?

13          MR. ADAMS:  Not noticed on his 30(b)(6), not

14  identified at any point until after discovery was closed

15  and after we received an expert report that mentioned

16  his knowledge on a -- a purported prior transaction

17  between Cirrus and Marvell.  They then served us with

18  initial -- or with supplemental initial disclosures that

19  added Mr. Nazari and added him as a witness

20  knowledgeable in the topic, well after discovery was

21  closed, Your Honor.

22          Your Honor, we tried to take his deposition

23  and asked them whether or not they would offer him up

24  for a deposition on that topic, and they refused.  So

25  this isn't a case where we just sat back.  We -- we

1   tried to cure whatever prejudice could occur, and they

2   refused to allow him to be deposed.

3          THE COURT:  All right.  Let me hear a

4   response, Mr. Adams.

5          MR. ADAMS:  Thank you, Your Honor.

6          MS. SCARPATI:  Good afternoon, Your Honor.

7   Jennifer Scarpati for the Defendant Marvell

8   Semiconductor, Inc.

9          THE COURT:  Good afternoon.  You may

10  proceed.

11         MS. SCARPATI:  Okay.  Lake Cherokee attempts

12  to paint this as a case in which they were greatly

13  prejudiced by some failure on the part of Marvell in

14  terms of discovery.  However, no prejudice has resulted

15  to Lake Cherokee in this case.  Putting Alex Nazari

16  aside for a moment, and I will address Mr. Nazari and

17  his deposition.

18         May I have the ELMO for a minute, please?

19         Lake Cherokee attempts to paint a picture

20  where the 2003 offer for sale of patents, including the

21  patents-in-suit, from Cirrus to Marvell was through

22  Mr. Nazari.  That's not the case.

23         Looking at this document -- if I can manage

24  the ELMO -- this is a document that was produced, and I

25  can bring the Court a copy if it's easier.  This was

1    produced on June 13th, 2011, two years ago.  And what

2    this document says -- it's an offer from Cirrus to

3    Marvell and says, Marvell to pay a sum of 8 million to

4    Cirrus Logic for the technology and patent transfer.

5    And up here it says, Cirrus Logic will transfer all mass

6    storage, hard drive, and DVD-related patents to Marvell.

7    They've had that document for two years.

8             Also, again putting Mr. Nazari aside, and I

9    will address it, Lake Cherokee's counsel was present for

10   Marvell's third-party deposition of Cirrus Logic during

11   fact discovery.  That was January 16th, 2013.  During

12   that deposition, counsel for Marvell, in the presence of

13   counsel for Lake Cherokee, questioned Cirrus's corporate

14   representative about this transaction, and there was an

15   exchange.  Lake Cherokee's counsel had full and fair

16   opportunity to question that witness and it did.  But he

17   did not bring up this transaction.  It just didn't do

18   it.  Now --

19             THE COURT:  That was not -- that was not

20   Mr. Nazari, was it?  That was another witness?

21             MS. SCARPATI:  No, that was -- that was

22   Cirrus' corporate witness.

23             THE COURT:  Let's talk about this witness.

24             MS. SCARPATI:  Absolutely.  So Lake Cherokee

25   says that this was a 30(b)(6) witness.  First of all,

1    that's not entirely true.  We actually kind of did a

2    good deed.  They had Mr. Nazari for seven hours as a

3    30(b)(1).  They had that on November 15th, 2012.  Then

4    we had designated him for 30(b)(6) topics, but they said

5    we did it too late in the day and it prejudiced them.

6    So we actually gave them Mr. Nazari again in January on

7    30(b)(6).

8            Now, they asked to take him a third time.

9    In response -- we said -- there's an e-mail to this

10   effect -- we said that under the Federal Rule 38(A)(2),

11   it was their duty to move the Court for leave since they

12   had already deposed Mr. Nazari.  They never did so.

13   What they did is they chose to -- to, you know, put this

14   issue aside and attack it on a MIL because they didn't

15   follow the federal rules.

16            Exclusion here would be too harsh a penalty.

17   Under this Court's law, and I have a case if Your Honor

18   would like to see it, this -- even if Marvell did fail

19   to disclose Mr. Nazari as a person with knowledge, and

20   we claim that we did no misdeed, but even if we did, it

21   was harmless.  Given the importance of this issue to

22   Marvell and the fact that Lake Cherokee had several

23   other avenues to this information, they were not

24   prejudiced.

25            And, finally, they did not do what they need

1    to do -- needed to to take Mr. Nazari's deposition, not

2    a second time, but a third time in this case.

3              THE COURT:  When -- when was this e-mail

4    sent that told them they needed to seek leave of the

5    Court for an additional deposition?

6              MS. SCARPATI:  I do not have a precise date,

7    Your Honor, but I -- actually -- I do not have a precise

8    date, Your Honor, but I believe that it was within a

9    week from when they requested it.  And they requested it

10   approximately a week after they received our damages

11   report.

12             Oh, one more thing, Your Honor.  Excuse me.

13   The document that I put on the ELMO, Lake Cherokee did

14   not mark that document in a single Marvell deposition

15   until our damages expert identified it to them during

16   his deposition, then they finally marked it.  They never

17   did anything with this information.  And now they seek

18   to use Mr. Nazari to get it out of the case.  Or --

19             THE COURT:  I don't -- I don't hear you

20   disputing the fact that you didn't disclose or designate

21   Mr. Nazari for these particular topics.

22             MS. SCARPATI:  He was not designated for a

23   30(b)(6) topic that would have encompassed this

24   transaction, but they would have had the opportunity to

25   ask certainly during his November 15th personal

1    deposition.

2              THE COURT:  All right.  Anything further

3    from Plaintiff on this?

4              MR. ADAMS:  Unless --

5              THE COURT:  Tell me what you know about this

6    e-mail saying, go seek leave of the Court?

7              MR. ADAMS:  The date -- the date of the

8    e-mail, I just checked it, Your Honor, was April 25th,

9    2013.  It was maybe two or three days after we received

10   the expert report and on which -- in which Dr. Ugone

11   says that the basis of some of his information is his

12   discussion with Mr. Nazari.

13             The Plaintiff -- defense counsel pointed to

14   the document that they put on the ELMO.  And, Your

15   Honor, one of the things that is at issue here is that

16   document does not relate at all to a transaction that

17   involves the patents-in-suit.  But I don't want to get

18   into that issue, Your Honor.

19             The only evidence that Dr. Ugone has that

20   says that the Cirrus to Marvell negotiations in 2003

21   related to the patents at issue here, according to him,

22   was based on his conversation with Mr. Nazari.  The very

23   first time that we had any inkling that Mr. Nazari had

24   any knowledge whatsoever about those negotiations was

25   when Dr. Ugone put it in his report.

```
 1            They then gave us the disclosure after that
 2    point, to tell us, oh, by the way, Nazari has this
 3    information.  We, Your Honor, tried to get a deposition.
 4    Rule 37, Your Honor, puts the burden on them to show
 5    it's -- it was harmless.  Not on us to say that we must
 6    now come to the Court after the close of discovery to
 7    try to get them to -- to allow us -- or the Court to
 8    allow us to take another deposition.  They had the
 9    obligation, Your Honor, to try to remove any prejudice
10    or harm to us, and they chose to say no.
11            Because of that, Your Honor, I believe that
12    this is evidence that they should not be allowed to
13    present.
14            THE COURT:  All right.  I'm going to grant
15    this motion in limine.  I want to make it clear to the
16    parties that the granting of a motion in limine in this
17    court is not an absolute barring of the evidence, but it
18    does require that it not be raised or mentioned before
19    the jury without specifically approaching and obtaining
20    leave of the Court.
21            Okay.  Let's go to Plaintiff's Motion in
22    Limine 4, evidence of invalidity, comparing prior art to
23    the Plaintiff's infringement contentions or to Marvell's
24    products rather than to the claims construed by the
25    Court.
```

1          Let me hear from the -- the Plaintiff.

2          MR. DOVEL:  Yes, Your Honor.

3          Looking at their opposition, they don't

4   disagree with the legal premise, which is that the only

5   way to address validity is by using the claim language

6   as construed by the Court and that it is improper and

7   inadmissible to do an analysis that compares prior art

8   to some contention by the Plaintiff.

9          In this case, what we're concerned about is

10  some of Dr. Blahut's contentions where he's made an

11  analysis that compares it to our preliminary

12  infringement contentions.

13         They also point out, Your Honor, that

14  Dr. Blahut has other contentions where he does not

15  apply -- where he doesn't do the right thing, where he

16  does apply the Court's constructions.  We're not trying

17  to seek to exclude that, Your Honor.  We want to prevent

18  any argument or evidence that would compare prior art to

19  our infringement contentions or to the accused chip.

20  Under Federal Circuit law that's controlling, that is

21  absolutely inadmissible and can't be presented to the

22  jury.

23         Unless the Court has any questions, I'll

24  rest.

25         THE COURT:  No.  I'll hear a response from

1   the Defendant.

2            MR. SHARTZER:  Your Honor, Adam Shartzer on

3   behalf of MSI.

4            THE COURT:  Proceed, counsel.

5            MR. SHARTZER:  Thank you.

6            Your Honor, it -- it's unclear exactly what

7   Lake Cherokee seeks to preclude here.  If you read the

8   scope of the relief it requests, they want to put us

9   from any evidence or argument as to certain -- certain

10  arguments that they point to with respect to

11  Dr. Proakis.

12           If I can bring up the slides, please.

13           The portion of Dr. Proakis' opinion that

14  they point to is this one paragraph here that is not

15  highlighted.  In that paragraph, he does suggest that he

16  took into account Lake Cherokee's preliminary

17  infringement contentions and applied the claim

18  construction that he was receiving from those

19  preliminary infringement contentions.

20           However, the remaining paragraphs, those

21  highlighted in yellow on this particular page, as well

22  as the next slide, do not at all discuss the application

23  with respect to Lake Cherokee's preliminary infringement

24  contentions.

25           In Dr. Proakis' report -- with the Court's

1    indulgence, I'll switch back to the ELMO, please.

2          Dr. Proakis made clear in this portion

3    that's highlighted in yellow that not in every instance

4    did he refer to the -- the claim constructions as coming

5    from the preliminary infringement contentions.  In fact,

6    where he didn't specifically point that out, he was

7    applying the Court's construction in every respect.

8    And -- and so based upon the scope of the relief that

9    Lake Cherokee seeks here to preclude any sort of

10    evidence or any sort of argument, it's far too broad

11    in -- in view of how the arguments have played out,

12    presented either through the expert reports or how it

13    might otherwise be -- be presented to the jury either in

14    opening or closing remarks.

15          THE COURT:  All right.  Thank you, counsel.

16          The Court agrees that the likelihood of harm

17    is greater in this case if the motion is granted.

18    Certainly in -- it's improper analysis to apply -- to

19    compare to the prior art in the competing products

20    rather than the claim construction, and certainly if

21    that's done, the Court will promptly respond to an

22    objection raised.  But to tie their hands at this point

23    in advance, I think, is -- is too draconian.  And I also

24    think if that happens, in addition to raising that

25    objection, it's certainly something that can be

1   addressed adequately on cross-examination.  So I'm going

2   to deny Plaintiff's Motion in Limine No. 4.

3          Motion in Limine No. 5 from the Plaintiff

4   seeks to preclude Marvell from offering conclusory

5   expert opinions.  This just looks like to me a back door

6   Daubert motion that was probably untimely because it's

7   filed past the cutoff for Daubert motions.  Tell me why

8   that's not what this is, Mr. Dovel.

9          MR. DOVEL:  I hadn't considered this, but I

10  think we could have brought this as a Daubert motion,

11  you're right.

12          THE COURT:  I think you should have.  I'm

13  going to deny this motion in limine.

14          MR. DOVEL:  All right.  Thank you, Your

15  Honor.

16          THE COURT:  No. 6, settlement agreements.

17  Is this not something that will rise and fall with my

18  prior Daubert rulings?  Why is this entitled to separate

19  treatment?

20          MR. DOVEL:  Your Honor, this is about the

21  admissibility of settlement agreements which includes

22  the Hitachi and LSI agreement on the grounds that they

23  are settlement agreements under Rule 408, so it's a 408

24  motion.  It's not a Daubert motion.  That's why we

25  didn't argue that before.  And as we said in our papers,

1   Your Honor, 408 is quite explicit.  It's the only excuse

2   we see from the Defendants is, well, ResQNet changed the

3   law.  It did not -- it did not deal with 408 at all.

4               In the 2012 case, or LaserDynamics, which

5   explicitly dealt with ResQNet and interpreted it,

6   expressly states that Rule 408 prohibits the

7   admissibility of settlement agreements to use to measure

8   damages.  So that's an explicit statement in

9   LaserDynamics commenting on ResQNet.

10              In addition, Your Honor, three -- at least

11  three courts in this district -- three times, three

12  cases, the Courts have recognized after ResQNet that

13  ResQNet did not alter or change the past -- the -- the

14  applicability of Rule 408.  It hasn't been erased from

15  the Federal rules.  It applies here, Your Honor.  And if

16  it applies, the settlement agreements should be excluded

17  under Rule 408.

18              Unless the Court has any question, we'll

19  submit.

20              THE COURT:  No.  I think your Daubert motion

21  was also urged on Rule 408 --

22              MR. DOVEL:  We had --

23              THE COURT:  -- and I had previously taken it

24  up.

25              MR. DOVEL:  We had a 408 --

1            THE COURT:  Again, this looks like a second

2    bite at the apple to me, counsel.

3            MR. DOVEL:  Well, it --

4            THE COURT:  And I also feel like this is

5    something that when we get down to the disputed

6    exhibits, these settlement agreements are going to come

7    up again as an admissible exhibit with I'm sure

8    objections raised to it.

9            MR. DOVEL:  Exactly, Your Honor.  The --

10   Dr. Ugone, we were focused on the LSI one.  There are

11   two settlement agreements here.  We raised as a Daubert

12   for that reason -- or as a -- as a motion in limine for

13   that reason, but they are exhibits, Your Honor.

14           THE COURT:  Let's do this.  I'm going to

15   deny this as a motion in limine, but I'm not going to

16   prejudice anybody's right to object to it as -- when we

17   get down to disputed exhibits.  We'll fight that fight

18   then.

19           All right.  That takes us to Plaintiff's

20   Motion in Limine No. 7 regarding lump sum transactions.

21           MR. ADAMS:  Your Honor, I think that's the

22   same issue.

23           THE COURT:  I think it is, too.  I think it

24   is, too.  And I think it's probably mooted to a certain

25   extent by my prior rulings.  I'm going to deny it as a

1   motion -- a motion in limine.

2           No. 8 -- Plaintiff's Motion in Limine 8

3   regards prosecution history.  Let me hear from you on

4   that.

5           MR. ADAMS:  Thank you, Your Honor.  And very

6   briefly, Your Honor, we -- we want to pre -- prevent any

7   argument -- or reference to any arguments that are made

8   in prosecution, any amendments that are made in

9   prosecution.  They're wholly irrelevant to any of the

10   issues that will be before the Court.  We've had

11   extensive meet and confers on this, Your Honor.  I tried

12   to get some explanation from them as to why they believe

13   there is any relevance to any amendments or arguments.

14           To the extent that they are relevant in this

15   case, they go to either the claim construction, which

16   this Court has already addressed, or they go to a

17   doctrine of equivalents argument to try determine the

18   scope of the claim, and we don't have a doctrine of

19   equivalents issue here.  So despite my attempts to try

20   to get us to resolve this issue, it still appears to be

21   an issue and that's why we seek the Court's guidance

22   pursuant to the MIL.

23           THE COURT:  Let me hear from the Defendants

24   on this -- excuse me, the Defendant.  We're down to one.

25           MR. SHARTZER:  Your Honor, essentially what

1    it seems to be occurring here is that there's a double

2    standard in the offing.  Certainly the prosecution

3    history was relevant to the Court's claim construction.

4    But MS -- or I'm sorry, Lake Cherokee is going to

5    attempt to take advantage of the presumption of

6    validity, and they're going to attempt to handcuff us

7    with respect to the prosecution history and not allow us

8    to refer to the prosecution history in an attempt to

9    making our case for invalidity under the clear and

10   convincing standard.

11            The prosecution history also has dual

12   relevance.  It's relevant to the Graham factors with

13   respect to obviousness for the jury's consideration, as

14   to the scope and content of the prior art and how that's

15   different from the patentee's invention.

16            Also, as to the Georgia-Pacific factors,

17   there's a 9th factor of the Georgia-Pacific analysis

18   when the jury needs to consider a -- a reasonable

19   royalty, and that factor requires the jury to consider

20   the difference between the invention and the old modes.

21   It ought to be able to look to the prosecution history

22   to determine the scope of those old modes and how the

23   invention here is somewhat different.

24            And, finally, to the extent that the -- that

25   Lake Cherokee suggests that we should not be able to

1    refer to the prosecution history, they have made certain

2    statements in the prosecution history as to specific

3    pieces of prior art.  If Marvell's products operate in

4    the way Lake Cherokee suggests, that -- that the prior

5    art operates, and that's certainly evidence that the

6    jury could consider, either more like -- more like an

7    argument that -- that Marvell's products are operating

8    like the prior art and thus don't infringe because

9    that's how they distinguished themselves from the prior

10   art and achieved an allowance of certain claims.

11            THE COURT:  Well, this is an area where the

12   Court's convinced that the likelihood for prejudice is

13   high.  And the Court believes that it would be a mistake

14   to throw the door wide open into the realm of any and

15   all prosecution history.  There's limited relevance,

16   perhaps some, but limited relevance in the Court's view

17   at this juncture post-claim construction.

18            I'm going to grant the motion in limine, and

19   I'm going to do it with these two caveats:  If the

20   Plaintiff opens the door, the door is opened, the

21   Defendant's going to be able to walk through it.  And if

22   the Defendant reaches a point in the trial where you

23   believe there is particular relevance that would

24   overcome my generalization, you're certainly free to

25   approach and seek leave at that time.  But outside of

1    those consequences, I'm going to grant the motion in

2    limine.

3              MR. SHARTZER:  Thank you, Your Honor.

4              THE COURT:  All right.  No. 9 is laches, and

5    I don't understand why we've got this as a motion in

6    limine, Mr. Adams.  It's not a matter to come up before

7    the jury.

8              MR. ADAMS:  I know.

9              THE COURT:  You know, this looks to me like

10   this is one of those follow the rules motions in limine.

11   Tell me -- tell me why we've got this in front of us.

12             MR. ADAMS:  The only reason we're here

13   today, Your Honor, is this.  We met and conferred.  We

14   were very, very close to agreeing on this motion in

15   limine or on this -- this issue.  The question came up

16   regarding inserting the word "solely" in front of

17   "argument."  And let me explain real quickly.  We're

18   trying to prevent any argument to the jury that relates

19   to laches.  They wanted to somehow suggest that you can

20   have a dual argument that you present to the jury.

21             Your Honor, I think the way this MIL is --

22   is read, it is follow the rules, and I just wanted to

23   make sure that we're on the same page, that any argument

24   or any evidence relating to laches -- and specifically,

25   Your Honor, for example, the argument that says Lake

1  Cherokee should have sued earlier.  That argument should
2  be presented to the Court and not the jury.
3              THE COURT:  Well, clearly laches is a matter
4  for the Court and not for the jury.  And we're not going
5  to backdoor questions involved to the jury during the
6  trial.
7              Let me hear a response from the Defendant.
8              MR. SHARTZER:  Your Honor, certainly MSI is
9  not going to stand up here and try to present a laches
10  case before the jury.  That's not MSI's intent.  During
11  the meet and confer process, we were concerned about
12  certain evidence that might have dual purposes given
13  that the -- the scope of the relief requested was vague
14  with respect to Lake Cherokee's requested relief.
15             They say -- they're requesting that we're
16  precluded from offering arguments to the jury regarding
17  equitable defenses, but then they modify the evidence
18  and they say evidence solely related to the defense of
19  laches.  And that created a -- a vagueness in the relief
20  requesting.  We weren't sure if they were trying to
21  preclude us from offering evidence that could be
22  considered to be dual purpose evidence.
23             THE COURT:  Can you be specific, counsel?
24  What evidence have you identified that you think falls
25  in this category of dual purpose?

1        MR. SHARTZER:  Well, we certainly have a

2    concern with respect to arguments their experts are

3    going to make, Dr. Barry and Mr. Mills.  With respect to

4    the fact their arguments is that the -- one cannot

5    create a commercially viable read channel product

6    without practicing the patents-in-suit.

7        We ought to be able to tell the jury that

8    these patents were owned by Cirrus, they were owned by

9    Broadcom, and for a period of 10 to 12 years, Marvell

10   has never been sued, despite the fact that it was

11   operating in this particular industry.  That's simply a

12   fact that Marvell was not sued.  It does go to laches,

13   but it also goes to this idea of the fact that you

14   cannot possibly practice or create a commercially viable

15   read channel product without practicing the patent.

16       A second example is, is goes to the

17   ownership of the patents, just in general.  Lake

18   Cherokee's certainly going to put on a case that -- that

19   marches through the chain of ownership of these patents.

20   We ought to be able to tell the jury that, yes, Broadcom

21   purchased these patents from Cirrus, and they did so at

22   a point in time which was approximately six years before

23   Broadcom sold those patents to Lake Cherokee.  That's,

24   again, a -- a dual purpose piece of evidence.  It's

25   factual.  It relates somewhat to laches, but it

1    certainly relates to other aspects of the case that Lake

2    Cherokee intends to present before the jury.

3             THE COURT:  Well, rather than sit here today

4    and try to prejudge every possibility where something

5    might have more than a single purpose, and given that

6    this is clearly something that's improper to be raised,

7    at least the laches defense is, before the jury, I'm

8    going to grant the motion in limine, but I'm going to

9    certainly allow you to approach when you think you've

10   reached that point where there is a relevant and

11   supportable purpose that might allow this in.

12            And if I agree with you at that point in the

13   trial and I have more specific information and context,

14   I may give -- I may give you leave, but I'm going to

15   reserve that until that time.  So to facilitate that,

16   I'm going to grant the motion in limine.

17            MR. SHARTZER:  Okay.  Thank you, Your Honor.

18            THE COURT:  All right.  No. 10, Marvell's

19   company character and achievements.

20            MR. ADAMS:  Your Honor, on their exhibit

21   list, they identify at least three or four documents

22   that are titled something like Marvell Wins the Inventor

23   of the Year Award, or charged as the best inventor in

24   the history of inventions, that type offing stuff.

25   And -- and we don't see any relevance to that

1    information.

2            No. 2, it's -- it's pure hearsay.  Nobody

3    would be able to actually testify about that.  So we --

4    we sought to -- to try to preclude and get them to agree

5    not to introduce any evidence regarding the great

6    character of Marvell in the field of innovation.  That's

7    the nature of this MIL, Your Honor.

8            There's also another area where I think

9    counsel just mentioned Marvell has numerous patents and

10   they're great innovators.  The problem is none of the

11   patents that have been identified in this case relate at

12   all to the read channel technology.  So that mentioning

13   Marvell's, you know, 70,000 patents, we don't believe

14   is -- is relevant, and it's more prejudicial than

15   probative of any issue in the case, which is why we've

16   brought this motion in limine.

17           THE COURT:  Let me hear a response.

18           MS. SCARPATI:  Your Honor, evidence

19   regarding Marvell's company character and achievements

20   and pattern of past innovation is directly relevant to

21   Lake Cherokee's allegations of copying.  We confirmed

22   through our motion in limine meet and confer process

23   that they do indeed intend to proceed with their having

24   argument at trial.  We would be greatly prejudice should

25   we not be able to rebut this with facts regarding our

1  company and the awards that it has received.  Obviously,

2  we will be prepared to take up these hearsay objections

3  during the exhibit arguments on the 7th.

4            Moreover, as you've seen today earlier, it's

5  undisputed that the hypothetical negotiation took place

6  in this case in the year 2000.  One of our proposed

7  exhibits is a press release indicating that Marvell

8  launched its first SoC in September of 2000, same month

9  as the hypothetical negotiation.  That is a company

10 achievement that Lake Cherokee's unspecified motion in

11 limine would seek to exclude.

12           However, our damages expert relies on that

13 to show that at the time of the hypothetical negotiation

14 with Cirrus, Marvell would not have deemed these patents

15 essential because it was doing its own thing and

16 launching products into the marketplace through routes

17 other than using the patented technology.

18           Finally, what Lake Cherokee failed to

19 mention is that they have designated trial testimony of

20 MSI's CEO, Sehat Sutardja, from the CMU trial.  And in

21 the designated passages that they have chosen, he

22 discusses his formation of Marvell and the reasons for

23 its success.  So what Lake Cherokee would have you do

24 here is preclude us from benefitting from this

25 information, but allow Lake Cherokee to use it.

```
 1              THE COURT:  Let me ask you this, counsel.
 2   Is this something that is going to be effectively
 3   covered by the various exhibits that would be offered
 4   that we're going to take up and dispute on the 7th?  It
 5   seems like to me if you've got your press release and
 6   you've got your articles saying you're great and this,
 7   that, and the other, those are all things that are going
 8   to come in or not come in as exhibits.
 9              If this is something that could fairly be
10   dealt with then, it seems like to me being able to
11   specifically look at particular items is a better way to
12   do this than some blanket shotgun in or out motion in
13   limine.  And if -- if you don't think that's adequate --
14   and I'm asking both sides -- tell me.  But if it is, I
15   think it would be fair to defer this to a case-by-case
16   analysis when we look at those particular exhibits.
17              MS. SCARPATI:  We would be agreeable to
18   that.
19              THE COURT:  Plaintiff's position?
20              MR. ADAMS:  And, Your Honor, we agree.
21              I -- I have one small issue.  I don't know
22   if there's going to be a live witness that would come in
23   separate and apart from the documents to testify about
24   this issue, but it only came up, Your Honor, because we
25   saw the documents that were on the list.  So if we
```

1   resolve the issue --

2               THE COURT:  This looks to me like this is a

3   documents dispute more than it is a true motion in

4   limine.

5               MR. ADAMS:  As far as I sit here today, yes,

6   Your Honor.

7               THE COURT:  All right.  I'm going to -- I'm

8   going to carry this motion in limine, and we'll look at

9   the particulars when we get to the exhibits.  If for

10  some reason once we're through with the exhibits, if

11  this is still a live issue in some respect, we can take

12  it back up at that time.  I'm hopeful that won't be

13  necessary.

14              Okay.  I'll carry Item 10 -- Plaintiff's

15  Motion in Limine 10 for the purposes announced into the

16  record, and we'll go to Motion in Limine No. 11.

17              MR. ADAMS:  Your Honor, this motion in

18  limine, I think, is largely undisputed, but it -- it

19  stays in here for this reason:  STAR CO is the parent

20  company of Lake Cherokee, the -- the Plaintiff.  STAR CO

21  has other subsidiaries.  I think defense counsel or

22  defense -- the Defendant agrees that those other

23  subsidiaries, wholly relevant to the case.

24              The only reason we're here now is that they

25  refused to agree to this MIL because we have told them

1   that we intend to very limitedly have our corporate rep,

2   Mr. Coverstone, talk about STAR CO simply to explain his

3   relationship to Lake Cherokee.  And because we intend to

4   offer very limited testimony about STAR CO, they have

5   said, all right, all of the other subs are -- are at

6   issue.

7            I don't think you'll hear anything from the

8   Defendants that say any of the other subs other than

9   Lake Cherokee have any relevance in this case, but I

10  couldn't get them to agree to not bring it up or mention

11  it, so that's why --

12           THE COURT:  All right.  Let me hear from

13  Marvell in response.  Where is Mr. Adams inaccurate,

14  Ms. -- counsel?

15           MS. SCARPATI:  Well, first of all,

16  Mr. Adams' case is inaccurate in this case in his

17  depiction of our discussions as to these two related

18  MILs.  MSI has been consistent throughout this case that

19  the named parties in suit are MSI and Lake Cherokee and

20  no other entity deserves mention in this case and has

21  relevance to any issue in suit.

22           We -- our -- our argument with respect to

23  STAR CO is that STAR CO is no exception.  It has no

24  relevance to any issue in this suit.  Going to the

25  subsidiaries for a moment before I return to STAR CO --

1               THE COURT:  Do you have a companion motion

2   in limine asking for the same relief?

3               MS. SCARPATI:  Yes, we do.  We do.  I

4   believe that it is -- oh, I do have a number for you.

5   We have companion MIL --

6               THE COURT:  Seems like I remember seeing

7   that.

8               MS. SCARPATI:  -- No. 11, yes.

9               THE COURT:  Well, we'll get to that when we

10  get to that.

11              MS. SCARPATI:  Okay.  So we believe that

12  STAR CO is irrelevant to this suit.  It's the parent

13  company of Lake Cherokee.  And whereas Lake Cherokee is

14  a straight non-practicing entity, STAR CO sells flash

15  drives on eBay.

16              We believe that the motivation to mention

17  STAR CO in this case is to add an air of legitimacy to

18  its subsidiary, Lake Cherokee's business.  Moreover,

19  Lake Cherokee in its motion in limine argues that its

20  damages expert relies upon STAR CO's existence in his

21  damages analysis.  This is not true.

22              The only mention of STAR CO in Mr. Mills'

23  report is to mention it as a parent company.  Anything

24  else that he says at trial would be outside the bounds

25  of his expert report and, therefore, impermissible.

```
 1              Finally, in deposition, Mr. Mills said that
 2  he was not aware of any direct relevance to STAR CO to
 3  the damages issues in this case.  Therefore, no mention
 4  of STAR CO in this case is proper.
 5              THE COURT:  Seems like you're arguing for
 6  what they're asking for in their motion in limine.  But
 7  be that as it may, I'm going to grant this motion in
 8  limine.  I'll reserve my ruling on the companion motion
 9  in limine when we get to Defendant's MILs.
10              I do want the Plaintiff to understand, if
11  they open the door to this issue, it's going to be fair
12  game.  If you want to start talking about all these
13  subsidiaries and your corporate structure and this,
14  that, and the other, then the Defendants are going to
15  get to go into those topics.  So bear that in mind.  But
16  I'll grant the motion in limine.
17              All right.  No. 12?  This, again, looks
18  like one of those follow the rules motions in limine,
19  Mr. Dovel.
20              MR. DOVEL:  I would have thought it were,
21  Your Honor, except that the dispute came up through --
22  at our meet and confer and they want to put on an expert
23  that they have not disclosed to us and that they have
24  not identified what the topic's are going to be.  It's
25  going to be in the category of a non-retained expert
```

1    that is an employee of Marvell.  They haven't told us
2    who it is.  They haven't told us the substance or the
3    basis of their testimony, which they're required to do
4    under Rule 26.  I can't be any more specific, Your
5    Honor, because they haven't told us who that is.
6              THE COURT:  Well, when that comes up, you
7    object to it and I'll deal with it then.
8              MR. DOVEL:  All right.
9              THE COURT:  But I'm not going to grant a
10   blanket across the board motion in limine about
11   previously undisclosed experts without anything more
12   specific, but certainly that doesn't -- the denial of
13   this motion in limine doesn't prejudice your right to
14   raise it when there is specificity for the Court to
15   address.
16             MR. DOVEL:  All right.  Thank you, Your
17   Honor.
18             THE COURT:  All right.  Those appear to be
19   all of the Plaintiff's motions in limine.  As much as I
20   would like all of you to stay up with me until late
21   tonight going through the rest of these motions in
22   limine, I think this is probably a good place to break.
23             We'll recess the pre-trial conference at
24   this time and take it up on the -- I believe the 7th is
25   the date I gave you for followup.

1          I did meet before we started the pre-trial

2    conference today with certain counsel from both sides in

3    chambers.  I'd like to see those same counsel in

4    chambers for about five minutes after we conclude today.

5    Other than that, we stand in recess, and I will see you

6    on the 7th.

7                    COURT SECURITY OFFICER:  All rise.

8               (Recess.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

140

```
 1                        CERTIFICATION

 2

 3            I HEREBY CERTIFY that the foregoing is a

 4  true and correct transcript from the stenographic notes

 5  of the proceedings in the above-entitled matter to the

 6  best of my ability.

 7

 8

 9
    SHELLY HOLMES                        Date
10  Deputy Official Reporter
    State of Texas No.: 7804
11  Expiration Date: 12/31/14

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```